**Mrs. Lizzie Beatrice EASTERWOOD, Plaintiff–Appellant,**

v.

**CSX TRANSPORTATION, INC., Defendant–Appellee.**

No. 90–8851.

United States Court of Appeals, Eleventh Circuit.

June 20, 1991.

---

James Irvin Parker, William Lundy, Tambra P. Colston, Parker & Lundy, Cedartown, Ga., for plaintiff-appellant.

Jack Harrell Senterfitt, Richard Thomas Fulton, Alston & Bird, Atlanta, Ga., for defendant-appellee.

Before JOHNSON and COX, Circuit Judges, and HENDERSON, Senior Circuit Judge.

JOHNSON, Circuit Judge:

This case arises on appeal following the district court's grant of a motion for summary judgment in favor of the defendant on the basis of federal preemption. 742 F.Supp. 676.

## I. STATEMENT OF THE CASE

Thomas Easterwood, on February 24, 1988, was working for the Duncan Wholesale Company delivering wood products in a long bed truck in Cartersville, Georgia. While crossing the Cook Street railroad grade crossing, he was struck and killed by a CSX train.

On June 3, 1988, Lizzie Beatrice Easterwood, Thomas' widow, filed the wrongful death action in district court. CSX answer-

ed, but it made no reference to the Federal Railroad Safety Act in its pleading. The District Court ordered discovery completed by November 30, 1989 and any motions for summary judgment filed within 20 days of that date. On December 19, 1989, CSX moved for summary judgment, alleging, among other things, that the Federal Railroad Safety Act provided a complete defense. Easterwood did not complain to the district court about CSX's failure to raise this defense in its answer. The district court granted summary judgment. Easterwood brought a timely appeal to this court.

## II. STANDARD OF REVIEW

The district court order granting summary judgment is subject to *de novo* review by this Court. *See Shipes v. Hanover Ins. Co.*, 884 F.2d 1357 (11th Cir.1989). This Court must ask whether there is any genuine issue of material fact and whether the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

## III. ANALYSIS

A. *The Failure to Raise the Pre-Emption Defense in the Answer*

In its motion for a summary judgment, CSX raised for the first time the possibility that Easterwood's state law negligence claims were pre-empted by federal law. Easterwood now claims that federal pre-emption is an affirmative defense which should have been raised in CSX's answer. *See* Fed.R.Civ.P. 8(c). If federal pre-emption is an affirmative defense, CSX's failure to specifically plead the defense in its answer or amended answer results in the waiver of this defense. *See Morgan Guar. Trust Co. of N.Y. v. Blum*, 649 F.2d 342, 345 (5th Cir. Unit B 1981).

Easterwood's failure, in the district court, to raise the argument that federal pre-emption is an affirmative defense prevents us from sanctioning CSX for its failure to include this affirmative defense in its answer. As a "general principle of appellate review[,] an appellate court will not

consider issues not presented to the trial court." *McGinnis v. Ingram Equip. Co., Inc.*, 918 F.2d 1491, 1495 (11th Cir.1990) (en banc). One exception to this rule is "when a pure question of law is involved and a failure to consider it would result in a miscarriage of justice." *Martinez v. Mathews*, 544 F.2d 1233, 1237 (5th Cir.1976). While it is undisputed that whether this affirmative defense was waived is a pure question of law, neither party can argue that our decision not to reach the issue would result in a miscarriage of justice. First, had Easterwood mentioned this technical failure of the pleadings before the district court, the district court could have given CSX leave to amend its answer, *see* Fed.R.Civ.P. 15(a), thus remedying any problem. Second, our Circuit has noted that the purpose of requiring affirmative defenses to be pled in the answer is to facilitate trial preparation. *See Hassan v. United States Postal Serv.*, 842 F.2d 260 (11th Cir.1988). In the past, we have been reluctant to enforce strictly the harsh waiver requirement where the plaintiff is unable to demonstrate any prejudice due to the lack of notice. *Id.* Easterwood has not established any prejudice due to this technical failure of the pleadings. Not only did Easterwood fail to move to reopen discovery, but she also told the district court, during oral arguments, that the existing exhibits, affidavits, and depositions were sufficient to defeat the motion for summary judgment. Therefore, it is not a miscarriage of justice if we decline to allow Easterwood to raise this argument, for the first time, on appeal.

B. *The Appropriateness of Summary Judgment*

Easterwood alleged that CSX was negligent for a number of reasons. First, Easterwood alleged that CSX was negligent for failing to maintain the crossing properly by failing to trim vegetation and level a hump near the tracks. Second, Easterwood alleged that CSX was negligent in maintaining the crossing properly by failing to install adequate warning signals. And third, Easterwood alleged that the train was neg-

ligently exceeding a reasonable speed at the time of the accident.[1] We will first examine whether, as CSX claims, federal law pre-empts each of these state law claims. We will then determine whether summary judgment was warranted for any of the surviving claims.

### 1. Federal Pre-emption

The Supreme Court has recognized that state law[2] is pre-empted under the Supremacy Clause in three circumstances. First, pre-emption will occur when Congress explicitly indicates that it intends to pre-empt state law. *English v. General Elec.,* —— U.S. ——, 110 S.Ct. 2270, 2275, 110 L.Ed.2d 65 (1990). The courts, however, will attempt to narrowly tailor the scope of the pre-emption to match congressional intent. *Id.* Second, pre-emption will be implied when Congress has indicated that the federal government will exclusively occupy a field of regulation. The *English* Court noted that congressional intent can be implied when the statutes and regulations are so pervasive that there is no room left for state regulation or when there are strong federal interests in exclusively regulating the field. *Id.* However, congressional intent must be " 'clear and manifest' " if the allegedly pre-empted field includes areas of traditional state interest. *Id.* (quoting *Jones v. Rath Packing Co.,* 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977)). Third, pre-emption will be implied when state law "actually conflicts with federal law." *Id.* Under this variety of pre-emption, if a party cannot comply with both federal and state law or when state law interferes with the accomplishment of congressional objectives, courts will imply pre-emption.

With these standards in mind, we turn to the legislative history of the Federal Railroad Safety Act of 1970, Pub.L. No. 91–458 (codified as amended at 45 U.S.C.A. § 421 *et seq.* (1986)). The Railroad Safety Act is the primary source of legislation dealing with the various railroad safety problems. The legislative history indicates that Congress was wary of the role of the states in rail safety. The House report stated that "[t]he committee does not believe that safety in the Nation's railroads would be advanced sufficiently by subjecting the national rail system to a variety of enforcement in 50 different judicial and administrative systems." H.Rep. No. 1194, 91st Cong., 2d Sess., *reprinted in* 1970 U.S. Code Cong. & Admin.News 4104, 4109 (hereinafter House Report). The committee also noted that "where the federal government has authority, with respect to rail safety, it *preempts the field.*" House Report at 4108 (emphasis added).

The Railroad Safety Act was the outgrowth of a report from a task force on railroad safety. The task force was primarily concerned with grade crossing accidents and derailments. *See* House Report, Appendix F, 4125, 4126–27. The task force noted the problems inherent in a hodgepodge of state safety regulations and concluded that "railroad safety ... requires a more comprehensive national approach." *Id.* at 4127. The task force recognized the potential tension between the need for increased speed and efficiency and the need for safety. *Id.* at 4128. One of its conclusions was that in order to obtain both high-

---

**1.** Easterwood also alleged in her complaint that the train was negligent per se for violating a town speed ordinance and that CSX was negligent for failing to install an energy absorbing device in the front of the train. At the start of oral argument before the district court, Easterwood specifically abandoned these two claims. Easterwood cannot, at this late date, resurrect these claims in this court.

**2.** It is clear that if federal law pre-empts state law then state tort law would be pre-empted regardless of whether it is common-law based or statutorily based. *See San Diego Bldg. and Trades Council v. Garmon,* 359 U.S. 236, 79 S.Ct.

773, 3 L.Ed.2d 775 (1959). The Supreme Court's holding in *Silkwood v. Kerr–McGee,* 464 U.S. 238, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984), is not to the contrary. In *Silkwood,* the Court held that Congress explicitly pre-empted state legislative and regulatory law in the nuclear power field while at the same time Congress explicitly chose to allow private parties to bring tort suits under state tort law. The Court noted that Congress' explicit intent to pre-empt only a portion of state law made nuclear power a special case. We decline to find, as Easterwood urges, that *Silkwood* holds that tort law is somehow immune to pre-emption.

er speeds and increased safety, safer grade crossings and a better educated public were needed. *Id.* The task force concluded that "[t]he motoring public is part of the safety problem at the grade crossing." *Id.* The task force recommended, among other things, a set of "uniform procedures and standards" to regulate grade crossings. *Id.* at 4130.

The Railroad Safety Act sought "to promote safety ... and to reduce railroad-related accidents." 45 U.S.C.A. § 421 (1986). .The Secretary of Transportation, through the Act, was authorized to "prescribe, as ·necessary, appropriate rules, regulations, orders, and standards for all areas of railroad safety ..." 45 U.S.C.A. § 431(a)(1) (1986). Congress declared "that laws, rules, regulations, orders, and standards relating to railroad safety shall be nationally uniform to the extent practicable." 45 U.S.C.A. § 434 (1986). However, Congress passed a savings clause, allowing states to adopt or continue in force any law relating to railroad safety until the Secretary of Transportation adopted a rule covering the same subject matter.[3] *Id.*

We can draw a few conclusions from this legislative history. The legislative history makes clear that because Congress was concerned with the problems created by the hodgepodge of state regulations it explicitly stated that it intended to pre-empt all state regulations covering the same subject matter as the federal regulations. Therefore, our initial task is to examine each claim and determine if any federal regulations have been promulgated which cover the conduct at issue. In such cases, we will find explicit federal pre-emption, but we will attempt to narrowly tailor the pre-

emption to match Congress' intent. However, even in the absence of a specific regulation, it is entirely possible that the breadth of the regulations, in the context of Congress' intent to pre-empt the field of railroad safety regulation, *see* House Report at 4108, may be sufficient for us to imply pre-emption of the entire field.

#### a. *Speed Limit*

Easterwood claims that the accident was caused because the train was traveling at a negligently high rate of speed. Various affidavits from the parties estimate the train speed at 32–50 m.p.h. on a section of track with a maximum speed of 60 m.p.h. We note that the question of train speed has been addressed by Congress through the Secretary of Transportation. The Secretary has established regulations governing the maximum speed for passenger and freight trains on various classes of track. *See* 49 C.F.R. 213.9 (1990). We therefore find this claim to be pre-empted since Congress has stated that as soon as the Secretary has established a safety regulation all state regulations governing the same area are pre-empted. *See* 45 U.S.C.A. § 434 (1986).

Easterwood first argues that pre-emption is inappropriate because the speed limits were not adopted in order to minimize the number of grade crossing accidents. Easterwood notes that the various speed limits found in 49 C.F.R. 213.9 (1990) are related to the class of track and the curve of the track. *See* 49 C.F.R. § 213.57 (1990). Easterwood notes that sections of track are classified on the basis of several factors including the track ballast, 49

---

**3.** Congress also passed a second savings clause permitting states to adopt more stringent state rules in order to eliminate a local safety hazard as long as the state rule is not incompatible with federal standards and the state rule does not create an "undue burden on interstate commerce." 45 U.S.C.A. § 434 (1986). This savings clause is irrelevant to the case at hand because a state does not legislate a general duty of care in order to eliminate a local safety hazard. The legislative history makes it abundantly clear that this savings clause is to be narrowly construed. The House Report states:

The purpose of this ... provision is to enable the States to respond to local situations not capable of being adequately encompassed within uniform national standards. The States will retain authority to regulate individual local problems where necessary to eliminate or reduce essentially local railroad safety hazards. Since these local hazards would not be Statewide in character, there is no intent to permit a State to establish Statewide standards superimposed on national standards covering the same subject matter.

House Report at 4117. We therefore find this savings clause inapplicable to the case at hand.

C.F.R. § 213.103 (1990), the number and quality of the cross ties, 49 C.F.R. §§ 109, 113 (1990), etc. Easterwood points to these factors and notes that the speed limits are not related to the density of the surrounding population. Easterwood, therefore, concludes that the Secretary adopted the speed limits to prevent derailments and not to prevent grade crossing accidents. However, the Supreme Court held in *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963), that it is irrelevant to pre-emption analysis whether the state law's objectives are similar to or different from the federal law's objectives. Pre-emption analysis turns on Congress' intent to pre-empt state law and on the nature of the federal regulations. The *Florida Lime & Avocado Growers* Court noted that a comparison of the similarities and divergences in the objectives of the federal and state regulations is simply a poor predictor of whether the federal regulations will preempt state law. *Id.* Moreover, Easterwood does not point to any legislative history for the speed limits and therefore she asks us to guess at the motives behind the Secretary of the Treasury. Such guessing is inherently suspect. While Easterwood assumes that the speed limits are designed to prevent derailments, it is equally valid to assume that the speed limits were set low enough that, in conjunction with adequate grade crossing signals and gates, the speed limits were intended to lessen the number of grade crossing accidents as well as lessen the chances of derailments.

Easterwood next argues that CSX's compliance with a speed limit should not affect a finding of negligence. Easterwood draws an analogy between compliance with the train speed limit and compliance with the national highway speed limit. *See* 23 U.S.C.A. § 154 (1990). Easterwood argues that an automobile driver's compliance with the 65 m.p.h. federal speed limit does not insulate a driver from liability. *See* Restatement (Second) of Torts § 288C (1965) ("Compliance with a legislative enactment ... does not prevent a finding of negligence where a reasonable [person] would take additional precautions."). If the train

speed limits were not part of a comprehensive statute, perhaps Easterwood's position would have merit. The code section governing highway speed limits does not directly overrule contrary state laws. This code section places conditions on the use of federal moneys. It therefore, only indirectly, establishes uniformity. More importantly, the train speed limits are part of a statutory scheme which explicitly preempts state regulations covering the same subject matter. While Easterwood's argument is superficially persuasive, the fundamental differences in the statutory scheme and legislative histories of the two acts require us to find federal pre-emption in the case of train speed limits.

### b. *Vegetation*

■ Easterwood also claims that excessive vegetation on the side of the track obstructed the views of the train engineers and the decedent, thereby causing the accident. We find this claim to be partially pre-empted. Under 49 C.F.R. § 213.37 (1990), track owners must keep vegetation on or immediately adjacent to the tracks under control. Because the Secretary has chosen to regulate vegetation, Congress explicitly has pre-empted all state regulation in this area. *See* 45 U.S.C.A. § 434 (1986); *See also Missouri Pac. R.R. Co. v. Railroad Comm. of Tex.*, 833 F.2d 570 (5th Cir.1987) (holding that 49 C.F.R. § 213.37 pre-empts all state regulation of vegetation immediately adjacent to railbed). However, while the Secretary has chosen to regulate the vegetation on and immediately adjacent to the railbed, the Secretary has not regulated vegetation which is not immediately adjacent to the railbed. *Id.* Therefore, we choose to adopt that portion of *Missouri Pac. R.R. Co.* dealing with state regulation of railroad vegetation. To the extent that Easterwood is bringing a claim for the vegetation near, but not immediately adjacent to, the tracks, this claim is not pre-empted.

### c. *Adequacy of the Grade Crossing*

Easterwood also argues that the grade crossing was inadequately constructed.

Easterwood claims, among other things, that the flashing lights were positioned in such a way that they could be obscured by the morning sun. Easterwood also complains that the grade crossing did not have a cross bar.

While the legislative history of the Federal Railroad Safety Act evinces a strong concern about the hundreds of annual deaths in grade crossing accidents, neither the Act nor the regulations specifically address the problem through federal regulation of the signals and the design of grade crossings. The Act requires the Secretary of Transportation only to study problems with existing grade crossings, see 45 U.S.C.A. § 433 (1986), and to create grade crossing demonstration projects, see 45 U.S.C.A. § 445 (West Supp.1990). Moreover, the Secretary of Transportation has not promulgated any regulations regarding grade crossings under his general power to regulate railroad safety. See 45 U.S.C.A. § 431(a)(1) (1986); see also 49 C.F.R. Parts 200–240 (1990).

Congress has passed legislation elsewhere in the code dealing with the grade crossing problem. Part of the chapter dealing with federal aid for highway projects includes a provision requiring states to conduct a systematic survey of all railroad crossings and then create and implement a schedule for bringing the grade crossings into compliance with the Manual on Uniform Traffic Control Devices for Streets and Highways. See 23 U.S.C.A. § 130 (1990); 23 C.F.R. § 646.214(b)(1) (1990). The states then would be eligible to use federal highway funds to aid the improvements. See 23 U.S.C.A. § 130(a) (1990).

■ CSX claims that the Railroad–Highway Crossing section of the chapter on Federal–Aid Highways pre-empts all state law. We disagree. This section of the code requires the states to survey all of the grade crossings and to formulate a sched-

ule of possible projects. 23 U.S.C.A. § 130(d) (1990). This section does not explicitly or implicitly pre-empt any state laws except perhaps any laws dealing with surveying and prioritizing projects. First, as opposed to the Federal Railroad Safety Act, *supra*, this section contains no explicit provisions pre-empting contrary or similar state law. Second, we are unable to imply pre-emption because this statute is not such a pervasive set of regulations that we could fairly imply a congressional intent to pre-empt the field.[4] The statute allows states to apply for federal aid. While Congress could have attached conditions on the aid money which would pre-empt all state laws, it did not. Finally, we are unable to find any actual conflict between the state and federal law. Allowing tort suits to go forward against railroad companies simply does not affect (or at best it only tangentially affects) the provision of federal aid to the states to help them build better railroad grade crossings.

■ Nevertheless, CSX points to Judge (now Justice) Kennedy's opinion in *Marshall v. Burlington Northern, Inc.*, 720 F.2d 1149 (9th Cir.1983). The *Burlington Northern* court implied in *dicta* that when a crossing has been upgraded by the states through the federal highway aid program then the railroads are insulated from liability. *Id.* at 1154. Even if *Burlington Northern* were the law of this Circuit,[5] this language is distinguishable from the case at bar. The record reflects that due to various financial constraints and logistical problems, the state wanted to upgrade the site but was unable to perform the upgrade. We hold that a policymaker's failure to act is insufficient to constitute pre-emption. We therefore adopt the conclusion of the Fifth Circuit and find that there is a qualitative difference between a failure of a policymaker to act and a case where the policymaker evaluates a situation and

---

4. Moreover, since the allegedly pre-empted field includes the pre-emption of state tort law, an area of traditional state interest, we would have to find a "clear and manifest" congressional intent in order to imply pre-emption. *See English v. General Elec.*, 110 S.Ct. at 2275.

5. In light of the preceding analysis, we have reservations about the holding of *Burlington Northern*.

then decides not to act "because [he or she has] determined it is appropriate to do nothing." *Missouri Pac. R.R. Co.*, 833 F.2d at 576. Therefore, because the state has neither upgraded the grade crossing nor affirmatively decided that the existing crossing was adequate, we have no occasion to decide whether a federally sponsored upgrade would insulate the railroad from liability. We do hold that, in the absence of a decision by a federally designated policymaker, state common-law liabilities are not affected by the federal highway aid provisions.

#### d. *The Hump in the Road*

■ Finally, Easterwood claims that there is a steep hump in the road elevating the railroad track above the roadway. Easterwood claims that traffic is forced to slow down in order to navigate over the hump. CSX does not cite, nor can we find, any federal statute or regulation regulating the angle of the roadway as it approaches the railroad tracks. Therefore, we conclude that this claim is not pre-empted.

In short, Easterwood's claims based on CSX's allegedly negligent speed and CSX's failure to trim the vegetation on or immediately adjacent to the tracks are pre-empted by federal law. Easterwood's claims based on CSX's failure to trim non-adjacent vegetation, CSX's failure to remove the hump in the road, and CSX's negligence in designing the grade crossing, all survive federal pre-emption analysis. We therefore turn to state law to determine if summary judgment was warranted for any of these claims.

#### 2. The Surviving State Law Claims
##### a. *The Vegetation Claim*

Easterwood claims that the vegetation on the side of the track contributed to the accident. The district court granted summary judgment because it held that there was no evidence that the vegetation either played a role in this incident or was within the defendant's control.

■ We reverse the district court's grant of summary judgment on this claim

for two independent reasons. After closely studying the defendant's briefs before the district court and before this court, we are unable to find any summary judgment request by the defendant on the vegetation claim. The district court therefore acted *sua sponte.* The district court may grant summary judgment on an issue only if a party moves for summary judgment on that issue. *See* Fed.R.Civ.P. 56(b) & (c).

■ We also reverse the district court because the summary judgment is simply not warranted. Summary judgment is warranted only when "there is no genuine issue as to any material fact and … the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). However, there is more than adequate evidence in the record to support the inference that vegetation played a role in this accident. Among other pieces of evidence, the brakeman on the train, Bobby Lanham, reported in his deposition that immediately following the accident he told an investigating police officer that some bushes and trees played a role in the accident. While this piece of evidence alone mandates denial of the defendant's summary judgment motion, one of the plaintiff's experts, Fogarty, stated in his deposition that the trees contributed to the dangerousness of the crossing. That statement, in conjunction with the rule that all evidence must be viewed in the light most favorable to the non-moving party, also would be sufficient to require a denial of summary judgment. *See Earley v. Champion Int'l Corp.,* 907 F.2d 1077, 1080 (11th Cir.1990).

■ Second, there is adequate evidence in the record demonstrating that the railroad is responsible for the vegetation. Fogarty testified that the trees were on the railroad's property. And, regardless of whose property the trees were on, the trees contributed to the dangerousness of the intersection and therefore increased the need for better signals. Therefore, even if the trees are out of the railroad's control, their very presence increases the need for the railroad to take other steps to improve the safety of the intersection. Finally, the

Georgia code places the initial burden of production on the railroad to prove all facts that are peculiarly within the railroad's knowledge. Ga.Code Ann. § 46–8–292 (1982); *see also Southern R.R. Co. v. James*, 170 Ga.App. 73, 316 S.E.2d 159 (1984).[6] Thus, the statute places the burden of production upon the railroad to show that the trees are not on the railroad's property.[7]

### b. *The Hump in the Road*

Easterwood claims that the hump in the road contributed to the accident. The District Court granted summary judgment because it held that there was no evidence that the hump either played a role in the accident or was within the defendant's control. We reverse the district court because once again the defendants did not move for summary judgment on this issue.

We also reverse the district court on the independent ground that summary judgment on this issue is not warranted. Easterwood has placed into the record a plethora of evidence demonstrating that the hump was dangerous and contributed to the accident. Fogarty testified at his deposition at length about the steepness of the hump and he stated that studies have concluded that when navigating similar humps drivers slow down and concentrate to such a degree on the hump that they fail to notice approaching trains. The expert also mentioned that the literature has warned of the dangers of humps and railroad crossings for over 40 years. Moreover, the brakeman on the train testified that Mr. Easterwood drove very slowly up the hump and onto the train tracks. Mr. Easterwood's conduct matches the conduct found in the studies provided by the expert. Because we are required to draw every reasonable inference in favor of the non-moving party, *Earley*, 907 F.2d at 1080, we must infer that the hump caused Mr. Easterwood to drive in the manner that he did.

Furthermore, the district court's holding that there was insufficient evidence that the defendant was responsible for maintaining the hump is also incorrect. First, the Georgia Code explicitly recognizes the duty of the railroad to maintain all of its grade crossings "in such condition as to permit safe and convenient passage of public traffic." Ga.Code Ann. § 32–6–190 (1985). This duty at the very least extends two feet beyond the cross ties. *Id.*[8] Second, the Georgia Code states that proof that a train hit a person is rebuttable prima facie evidence of negligence on the part of the railroad. Ga.Code Ann. § 46–8–292 (1982). Therefore, the district court cannot issue summary judgment until the railroad overcomes its burden of production. Third, there was evidence that the hump contributed to the dangerousness of the grade crossing and therefore increased the need for better signals and warnings.

### c. *The Warnings at the Grade Crossing*

CSX argues that it met, as a matter of law, its duty to warn because it claims that the existing warning signals and the train's whistle were sufficient to put Mr. Easterwood on notice. CSX points out that the train's head light was illuminated and that the whistle was blowing. CSX also alleges that the intersection had three separate sets of dual, red warning lights which are activated by an approaching train 1500 feet from the intersection. Therefore, motorists have anywhere from 17 to 32 seconds

---

6. In this diversity action, the substantive law to be applied is Georgia tort law, while federal law governs the procedure. *See Erie R.R. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Despite their procedural nature, burdens of proof are sufficiently related to substantive rights that they are governed by state law in diversity actions. *See Cities Service Oil Co. v. Dunlap*, 308 U.S. 208, 60 S.Ct. 201, 84 L.Ed. 196 (1939).

7. At trial, the burden of proving pre-emption rests with the party asserting it. Therefore the defendants may rebut the vegetation claim by establishing that all the trees at issue are those covered by federal regulations. Of course, this is a question of law to be decided by the trial judge.

8. The statute strongly implies that the duty may extend beyond the two feet mentioned in the statute.

notice of the train's approach.[9] CSX also alleges that the crossing had passive warnings including two reflectorized railroad crossbuck signs, a white stop bar and a white "RXR" warning painted on Cook street, and a yellow "RXR" advance railroad warning sign.

CSX argued to the district court that as an alternative to finding pre-emption for this claim, the district court could grant summary judgment on the claim itself. The district court granted summary judgment on pre-emption so it did not reach CSX's alternative argument. CSX renewed the alternative argument in this Court. Because we decline to find pre-emption, we now turn to the merits of this claim.[10]

 Georgia law recognizes a cause of action for a failure by a railroad to warn adequately of the approach of a train to a grade crossing. *See Isom v. Schettino,* 129 Ga.App. 73, 199 S.E.2d 89 (1973). CSX argues that the existing passive and active warnings are sufficient for this Court to conclude that it was not negligent as a matter of law. However, there is a significant amount of evidence in the record suggesting that this grade crossing is extremely dangerous and that better warnings were needed. One traffic expert, Burnham, testified in his deposition that the design of the grade crossing made it extremely hazardous: he testified that the road does not cross the tracks on a perpendicular angle; that there are private roads placing substantial traffic into the intersection; and that immediately after crossing the tracks a driver would have to attempt to merge with highway traffic. Another expert, Fogarty, testified about the dangers of the hump in the grade crossing.

There also are various references throughout the depositions that more than a few accidents had occurred at this crossing. Both of the two traffic experts testified that the existing signs were not in compliance with various regulations and standard accepted engineering practices. One of the experts, Burnham, witnessed the existing warning signals malfunctioning by signaling that a train was coming when none ever came. Another witness, Taylor, stated that he was almost hit by a train a week before the accident and that the signals never warned him of the train's approach. Burnham also stated that the stop bar painted on the road was faded. Fogarty stated that one of the warning crossbucks was partially obscured by a power pole and thus fell below regulations and that the second cross buck was positioned so that it was not visible to approaching traffic. Fogarty also concluded that the warning lights failed to meet standards because they were located and designed so that they were easily obscured by the morning sun. A third expert, McLendon, noticed that the warning lights were extremely dirty. As a result of the dangers of the intersection and the inadequacies of the existing warning systems the two traffic experts and a retired railroad engineer concluded that gates were needed at this intersection. It is clear that summary judgment is not warranted because there is a material issue of fact as to whether the existing warning signs are adequate.

### d. *Contributory Negligence*

CSX finally argues that summary judgment should have been granted because Easterwood's action is barred under the

---

**9.** The engineer claimed that the train was travelling at 32 m.p.h. or 46.93 feet per second. At such a speed, we take judicial notice that the 1500–foot motion detector would afford automobiles approaching the grade crossing a 31.96–second warning. Various witnesses claimed the train was going up to 50 m.p.h. or 73.33 feet per second which would result in a 20.46–seconds notice. CSX claims that because the track has a 60 m.p.h. speed limit its trains can travel up to 60 m.p.h. or 88 feet per second which would result in 17.05 seconds of notice. While the plaintiff's claim of negligence based on excessive speed is pre-empted, evidence of speed is

relevant to the issue of the adequacy of the warning system.

**10.** We found in section III.B.1.c., *supra,* that this claim was not pre-empted by federal law. The Georgia Court of Appeals has rejected the parallel argument that a similar claim was pre-empted because the Georgia Department of Transportation allegedly decides which warnings are appropriate for a given grade crossing. *See Southern R.R. Co. v. Georgia Kraft Co.,* 188 Ga.App. 623, 373 S.E.2d 774 (1988).

doctrine of contributory negligence. In grade crossing accidents under Georgia law, a plaintiff's action is barred if he or she is more than 50% at fault. *See* Ga. Code Ann. § 46–8–291 (1982). The existence of contributory or comparative negligence is one of fact "and will not be determined by the courts as a matter of law except in palpably clear, plain and undisputed cases." *Iler v. Seaboard Air Line R. Co.*, 214 F.2d 385, 388 (5th Cir.1954) (applying the Georgia grade crossing comparative negligence law).

In Georgia, contributory negligence has been held to be clear in at least two types of cases. If the driver is aware of the train and attempts to beat the train, then the proximate cause of the accident is not, as a matter of law, the railroad's failure to warn. *See Southern Ry. v. Blake*, 101 Ga. 217, 29 S.E. 288 (1897).[11] Similarly, if the driver saw the train, or in the exercise of ordinary care should have seen the train, and nevertheless continued across the tracks, then the railroad cannot be held liable for failing to warn. *See Seaboard Coast Line R.R. Co. v. Mitcham*, 127 Ga. App. 102, 192 S.E.2d 549 (1972).[12]

CSX argues that summary judgment is warranted on this claim because Easterwood was wholly at fault for entering the grade crossing when he did. There, however, is absolutely no evidence that Easterwood tried to beat the train across the tracks or that he actually knew about the train before starting to cross the tracks. The undisputed evidence shows that Mr. Easterwood slowly approached the intersection and without varying his speed slowly drove into the path of the train. Viewing this evidence in the light most favorable to the non-moving party, *Earley*, 907 F.2d at 1080, we can only conclude that Mr. Easterwood did not attempt to beat the train across the tracks and that he actually was unaware of the oncoming train.

While there is absolutely no evidence showing that Mr. Easterwood actually knew about the signals or about the oncoming train before entering onto the tracks, the evidence as to whether he should have known about the oncoming train is conflicting. Ms. Stephenson stated in her affidavit that she was directly behind Mr. Easterwood and that when she was a block away she heard the train whistle and the rumble of the train. She then stated that she saw the red flashers warning of the oncoming train before they got to the grade crossing. Ms. Stephenson therefore both saw and heard indications that a train was coming. However, there are disputes of material facts as to both of these areas of Ms. Stephenson's statement. Another eye witness, Sheppard, disputed Ms. Stephenson's statement that the lights activated when Mr. Easterwood was some distance from the intersection. This witness stated that the lights activated "just prior to the time Mr. Easterwood drove under them." That same witness testified that the sun was bright that morning and that Mr. Easterwood was traveling east.

11. CSX relies heavily upon *Joyce v. Georgia, S. & Fla. Ry. Co.*, 122 Ga.App. 712, 178 S.E.2d 575 (1970), a case which in many ways resembles the case at hand. However, we find *Joyce* distinguishable because despite the similarities there is one large distinguishing factor: the court in *Joyce* concluded that the decedent "must have seen the [warning] signal, as disclosed by the stopping of his vehicle short of the tracks." *Id.* 178 S.E.2d at 576. This fact is crucial to *Joyce*'s analysis and absent from the case at hand. There is absolutely no evidence in the record that the decedent actually saw, or acted as if he saw, either the signal or the train before he went across the tracks.

12. Oddly enough, there is a whole genre of cases in which automobile drivers hit the twentieth or so car in a freight train and then attempted to sue the railroad for the failure to warn. *See, e.g., Pate v. Georgia S. & Fla. Ry. Co.*, 196 Ga. App. 211, 395 S.E.2d 604 (1990); *Suib v. Seaboard Sys. R.R., Inc.*, 185 Ga.App. 713, 365 S.E.2d 842 (1988); *Seaboard Coast Line R.R. v. Sheffield*, 127 Ga.App. 580, 194 S.E.2d 484 (1972). The Georgia Courts have uniformly denied recovery in these "car hits train" cases. In doing so, the courts have broadly stated that, absent special circumstances, railroads do not owe a duty to warn drivers of "something as starkly obvious as a train." *Sheffield*, 194 S.E.2d at 485. However, it is clear that, because of the context of the language in the original *Sheffield* opinion and because this language has been quoted only in these "car hits train" cases, the language has been implicitly limited by the Georgia courts to this genre of cases.

The plaintiff's expert, Fogarty, testified that the warning lights were poorly designed and poorly located, increasing the risks of a problem with glare. Furthermore, there was considerable evidence that the warning lights were highly unreliable and that because they produced false warnings, locals tended to ignore the warnings. Easterwood depos. at 64 (stating that she had been with her husband on at least one occasion when the lights flashed but no train showed up.); Burnham depos. at 28, 39 (stating that while he was studying the grade crossing the lights malfunctioned and that several cars ignored the lights and went through the grade crossing.) Also, there was extensive record support for the proposition that motorists had a limited view of any oncoming trains due to various obstructions, including vegetation. Fogarty depos. at 62–64 (The line of sight was 150′ when motorists need 720′ to observe oncoming trains going 30 m.p.h. and to be able to clear the tracks in time.) It therefore is debatable whether Mr. Easterwood saw the flashing warning lights due to their timing and the possibility of glare.[13] Furthermore, there is evidence in the record showing that if Mr. Easterwood had not seen the warning lights, then the inadequate line of sight would have prevented him from seeing the train with sufficient time to avoid the accident.

Also there is some dispute in the record as to whether Mr. Easterwood should have reasonably heard the train and the various bells and whistles. First, there is evidence in the record that Mr. Easterwood had turned on his heater on that cold morning.

Taking all the reasonable inferences in the non-movant's favor, we can conclude that he probably had his windows closed. There also were statements, contradicting Ms. Stephenson's statements, that the train did not sound its whistle.[14]

In conclusion, there is sufficient evidence in the record creating a dispute of material issues of fact for us to conclude that summary judgment is not warranted on the issue of whether Mr. Easterwood's contributory negligence is the cause of the accident. In so holding we note that contributory negligence is almost invariably a question for the jury and that CSX bears the burden of proof on this issue at trial.

## IV. CONCLUSION

We AFFIRM the court below on its finding that federal law pre-empts the speed claim and a portion of the vegetation claim. We REVERSE the court below on its finding that federal law pre-empts the negligently designed crossing claim and a portion of the vegetation claim. We also REVERSE the district court's grant of summary judgment for each of the non-preempted claims and for the case as a whole. We REMAND this case for further proceedings consistent with this opinion.

---

**13.** CSX is correct that Ga.Code Ann. § 40–6–140 (1989) which requires motorists to stop at all grade crossings when "[a] clearly visible ... signal device gives warning of the immediate approach of a train" results in violators being deemed contributorily negligent as a matter of law. *See Atlantic Coast Line R.R. Co. v. Hall Livestock Co.,* 116 Ga.App. 227, 156 S.E.2d 396 (1967). However, it is a disputed question of fact whether the signal device was "clearly visible." Furthermore, the *Hall Livestock* court held that the statute applied only to those who were aware of an oncoming train and ventured onto the tracks. The court noted that cases brought by motorists who were *actually* unaware of the nearness of the train were governed by common-law determinations of rea-

sonableness and not by this statute. *Id.* 156 S.E.2d at 398.

**14.** While generally positive testimony (such as I heard the whistle) is better than negative testimony (such as I did not hear the whistle) the district court may not accept positive testimony to the exclusion of negative testimony on a motion for summary judgment. It is a credibility question whether one witness' memory is more reliable than another witness' memory, and such credibility determinations are not to be made on a motion for summary judgment. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510–2511, 91 L.Ed.2d 202 (1986).