John J. EMERY and Loretta Emery, Plaintiffs–Appellees,

v.

SOUTHERN RAILWAY COMPANY and J. A. Bradley, Defendants–Appellants.

Orbin Horton JOHNSON, Plaintiff–Appellee,

v.

SOUTHERN RAILWAY COMPANY and J. A. Bradley, Defendants–Appellants.

Court of Appeals of Tennessee, Eastern Section.

May 20, 1993.

Permission to Appeal Denied by Supreme Court Oct. 4, 1993.

**558**

Earl R. Layman and William T. Magill, with Layman, O'Connor, Petty & Child, Knoxville, for defendants-appellants.

Charles Terry and Denise Terry, Morristown, for plaintiffs-appellees John J. Emery and Loretta Emery.

D. Scott Hurley, Knoxville, for plaintiff-appellee Orbin H. Johnson.

## OPINION

SANDERS, Presiding Judge (Eastern Section).

Defendants have appealed from a jury verdict in favor of the Plaintiffs for personal injuries received when the automobile in which they were riding was struck by Defendants' train at a crossing.

In June, 1990, the Plaintiffs–Appellees, John Emery and Orbin Johnson, were riding in an automobile traveling in a westerly direction on Warrenburg Road in Hamblen County toward a railroad crossing. At that same time, Defendant Southern Railway Company (Southern) was operating its freight train in a southerly direction on its tracks. The train was being operated by its engineer, Defendant–Appellant J. A. Bradley. The train was traveling at a speed of 39 miles per hour. When it was approximately 350 feet from the crossing of Warrenburg Road the automobile in which the Plaintiffs were riding came to a stop with its front wheels resting between the rails on the crossing. Defendant Bradley (the engineer) applied the emergency brakes immediately but the train, which consisted of two engines and approximately 100 boxcars, struck the automobile before it came to a stop some 1,500 feet past the crossing. As a result of the collision both of the Plaintiffs were injured.

They each filed suit against the Defendants for their injuries and Plaintiff–Appellee Loretta Emery joined in the complaint with her husband, John Emery, asking for damages for the loss of consortium. Each of the complaints alleged various acts of common law and statutory negligence by Southern and the engineer as the proximate cause of Plaintiffs' injuries. They alleged the train was traveling at an excessive and dangerous rate of speed without regard to the traveling motorist on the highway; Southern failed to place speed restrictions of less than 45 miles per hour at the crossing; it knew or should have known that a speed of 45 miles per hour was dangerous. They alleged an embankment approximately 20 feet high near the crossing obstructed the view of both the operator of a motor vehicle and the engineer of the train. They alleged the train crew of Southern failed to give the required warnings of T.C.A. § 65–12–108 of blowing the whistle or ringing the bell. They alleged Defendants failed to operate the train in accordance with the speed restrictions promulgated by Southern and in effect at the time of the accident.

After the complaints were filed, an order was entered consolidating the two cases for trial and they are consolidated on this appeal. After they were consolidated, a number of motions were made and certain amendments were made to the complaints, none of which are pertinent to this appeal except Defendants' motion to dismiss and/or for partial summary judgment as amended.

As pertinent here, the Defendants asked the court to dismiss or grant summary judgment as to the allegations that excessive speed of the train was an act of negligence since they failed to allege Defendants exceeded the limits set by the Federal Railroad Safety Act of 1970 (FRSA). The motion, as pertinent here, stated: "The Federal Railway Safety Acts specifically controls the speed at which trains may operate by classifying sections of track and assigning to each classification a maximum speed limitation. Any common law or statutory negligence claim based on the train's speed is pre-empted by federal law. Defendant accordingly moves that Summary Judgment be granted as to all averments of the Complaint relating to train speed, insofar as said speeds are not in excess of those allowed by federal regulation, inasmuch as there is no issue as to any material fact related thereto and defendant is entitled to judgment as a matter of law." The motion was supported by documents and affidavits which established that the section of track upon which the train was being operated at the time of the accident was Class 4 track pursuant to federal regulations and those regulations limited the speed of freight trains operating on Class 4 track to 60 miles per hour. Although the Plaintiffs did not refute these facts, the court denied the motion because he did not think the FRSA preempted state law.

Upon the trial of the case the jury found the issues in favor of the Plaintiffs and fixed the damages of the Emerys at $331,800 and the damages of Mr. Johnson at $17,500.

The Defendants' motion for a new trial was overruled and they have appealed, presenting the following issues for review:

"1. Whether it was error for the trial court to overrule defendants' Motion to Dismiss and/or for Summary Judgment with regard to federal preemption of plaintiffs' common law or statutory negligence claims based on excessive train speed.

"2. Whether the Court erred in allowing plaintiffs' alleged expert witness, McAmis, to testify over objection as to prerogatives available to Southern Railway Company's management.

"3. Whether the Court erred in allowing plaintiffs' alleged expert to criticize locomotive design without being qualified as an engine design expert.

"4. Whether plaintiffs' counsel's question to alleged expert McAmis, suggesting that engineers do not always blow at crossings, gleefully withdrawn upon objection, was so prejudicial as to not be cured by the Court's admonishment to the jury to disregard it.

"5. Whether the Court erred in allowing introduction as an exhibit an enlargement of certain portions of the Railroad Highway Grade Crossing Handbook.

"6. Whether the Court erred in allowing Linda Estes to testify over defendants' objection that she met with a representative of 'the railroad' with regard to complaints about excessive speed of trains at the crossing when no evidence was introduced that the person with whom she met was a representative of 'the railroad'.

"7. Whether the Court erred in declining to charge special requests for jury instructions."

In view of our holding on Defendants' first issue, we do not deem a lengthy review of the evidence to be necessary. Suffice to say, it was the testimony of Mr. Johnson that he stopped his car about 50 feet before he got to the railroad tracks; he looked to his right and to his left but did not see a train nor did he hear the whistle or bell of the train. As he started across the crossing he was hit by the train.

The conductor of the train testified he saw Plaintiffs' automobile when it was about 200 feet from the crossing and the train was about 500 feet from the crossing. When the car got within about 100 feet of the crossing it began to "slide" and stopped with its front wheels between the tracks. The engineer and brakeman testified they saw the car on the tracks when the train was about 350 feet from the crossing. The engineer put on the emergency brake but the train hit the car before stopping. The Defendant offered proof it gave the required signals before reaching the crossing but Plaintiffs presented witnesses who testified they did not hear the signals.

■ This brings us to Defendants' first issue of "Whether it was error for the trial court to overrule defendants' Motion to Dismiss and/or for Summary Judgment with regard to federal preemption of plaintiffs' common law or statutory negligence claims based on excessive train speed." The U.S. Supreme Court has recognized that state law is pre-empted under the Supremacy Clause, U.S. Const. art. VI, cl. 2, in three circumstances:

"First, Congress can define explicitly the extent to which its enactments pre-empt state law. Pre-emption fundamentally is a question of congressional intent, and when Congress has made its intent known through explicit statutory language, the courts' task is an easy one.

"Second, in the absence of explicit statutory language, state law is pre-empted where it regulates conduct in a field that Congress intended the Federal Government to occupy exclusively. Such an intent may be inferred from a 'scheme of federal regulation ... so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it'....

"Finally, state law is pre-empted to the extent that it actually conflicts with federal law." *English v. General Elec.*, 496 U.S. 72, 79, 110 S.Ct. 2270, 2275, 110 L.Ed.2d 65, 74 (1990). (Citations omitted.)

With these guidelines in mind, we now look to the FRSA to see if it provides a basis for pre-emption of state law, whether it be statutory or common law tort claim based on excessive train speed not in excess of the permissible limits. 45 U.S.C. § 434 (1990) provides:

The Congress declares that laws, rules, regulations, orders, and standards shall be nationally uniform to the extent practicable. A State may adopt or continue in force any law, rule regulation, order, or standard relating to railroad safety until such time as the Secretary has adopted a rule, regulation, order, or standard covering the same subject matter of such state requirement. A State may adopt or continue in force an additional or more stringent law, rule, regulation, order, or standard relating to railroad safety when necessary to eliminate or reduce an essentially local safety hazard, and when not incompatible with any Federal law, rule, regulation, order, or standard, and when not creating an undue burden on interstate commerce.

It is clear that under FRSA Congress intended to pre-empt any and all state laws or regulations concerning railroad safety except for those permitted under either of two exceptions set forth in the statute. *See Mahony v. CSX Transportation, Inc.*, 966 F.2d 644 (11th Cir.1992); *Easterwood v. CSX Transportation, Inc.*, 933 F.2d 1548 (11th Cir. 1991); *Grand Trunk Western R.R. Co. v. City of Fenton*, 439 Mich. 240, 482 N.W.2d 706 (1992).

Likewise, Tennessee courts recognize that the FRSA pre-empts state law on railroad safety. *See Illinois Cent. Gulf R.R. Co. v. Tennessee Pub. Serv. Comm'n.*, 736 S.W.2d 112, 114–117 (Tenn.App.1987). In *Illinois Cent. Gulf,* the railroad company claimed an order issued by the Tennessee Public Service Commission regarding safety standards for the construction and maintenance of walkways in railroad yards was pre-empted by the FRSA. After recognizing that the FRSA did indeed pre-empt state law, the court found that the state regulation fit within the first exception to FRSA pre-emption. The court said that because the Secretary of Transportation had not adopted a rule or regulation covering railroad walkways, the state order was therefore not pre-empted. In other words, had the Secretary of Transportation issued a regulation or rule on the matter, as the Secretary has done with speed limits, such rule or regulation would pre-empt any state law covering the same subject matter.

Pertinent here, the Secretary of Transportation has promulgated regulations concerning train speeds. The regulation 49 C.F.R. § 213.9 sets forth "operating speed limits" from 10 m.p.h. to 110 m.p.h. depending on the "class" of track. In the case at bar, the railroad track was classified as Class 4 track. The "maximum allowable operating speed for freight trains" on a Class 4 track is 60 m.p.h. Southern's train was going 39 m.p.h. Since

Southern was going below the federal train speed limit, any tort claim based on excessive speed is pre-empted by the FRSA.

Plaintiffs assert that a common law tort claim is not pre-empted by the FRSA; that is, the term "state law" does not encompass a tort claim based on common law. We cannot agree. If federal law pre-empts state law, then state tort law would be pre-empted also, regardless of whether it is common law based or statutorily based. *Easterwood*, 933 at 1552 n. 2 (citing *San Diego Bldg. and Trades Council v. Garmon*, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959)).

Plaintiffs claim a recent United States Supreme Court decision, *Cipollone v. Ligget Group, Inc.*, —— U.S. ——, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992) alters this rule. In *Cipollone*, a smoker's estate claimed certain cigarette manufacturers were responsible for the smoker's death because the cigarette manufacturers breached express warranties contained in their advertising, because they failed to warn customers about the hazards of smoking, because they fraudulently misrepresented those hazards to consumers, and because they conspired to deprive the public of medical and scientific information about smoking. The cigarette manufacturers asserted, inter alia, that the 1969 amendment to section 5(b) of the 1965 Federal Cigarette Labeling and Advertising Act expressly pre-empted any common law actions against them based on their conduct after 1969. Section 5(b) of the Act, as amended in 1969, provided that "[n]o requirement or prohibition based on smoking and health shall be imposed under State law with respect to the advertising or promotion of" lawfully labeled cigarettes. The Court, in deciding whether any of Cipollone's four common law based claims were pre-empted, stated, "The central inquiry in each case is straight-forward: we ask whether the legal duty that is the predicate of the common law damages constitutes a 'requirement or prohibition based on smoking and health ... under State law with respect to ... advertising or promotion,' giving that clause a fair but narrow reading." *Cipollone*, —— U.S. at ——, 112 S.Ct. at 2621. Using this test, the Court reasoned that Cipollone's claims based on failure to warn and fraudulent . misrepresentation by neutralizing the effect of the warning labels were expressly and obviously, pre-empted by the Act as these claims were based on state common law tort law relating to advertising. *Id.* at ——, 112 S.Ct. at 2621. The Court then held that Cipollone's other claims were not pre-empted as they were not based on state law "requirement or prohibition ... with respect to ... advertising or promotion." For example, Cipollone's breach of warranty claim sounded in contract and only indirectly related to advertising. *Id.*

Applying the *Cipollone* test to the case at bar does not alter the pre-emption rule as applied to state tort law in the case at bar. Section 434 states, "A State may adopt or continue in force any law, rule, regulation, order, or standard relating to railroad safety until such time as the Secretary has adopted a rule, regulation, order, or standard covering the subject matter...." Plaintiffs' claim is based on excessive speed. To establish liability for excessive train speed, Plaintiffs must rely on state tort law relating to railroad safety. For the railroad track on which the collision took place, the Secretary has "adopted a rule ... covering the subject matter;" to-wit, a 60–m.p.h. speed limit. Like Cipollone's claim that the cigarette label warnings were inadequate despite the manufacturers' conformance with federal law, Plaintiffs' claim that Southern was traveling at an excessive speed despite Southern's conformance with federal law must fail because the claim is pre-empted.

It was expressly held in *Easterwood v. CSX Transp., Inc.*, 933 F.2d 1548 (11th Cir. 1991), that the FRSA pre-empts any action based on excessive train speed. In a thoughtful and well-written opinion, Judge Johnson first discussed the purpose of the FRSA and its pre-emption of state law as follows:

> The [FRSA] is the primary source of legislation dealing with the various railroad safety problems. The legislative history indicates that Congress was wary of the role of the states in rail safety. The House report stated that "[t]he committee does not believe that safety in the Nation's railroads would be advanced sufficiently by

subjecting the national rail system to a variety of enforcement in 50 different judicial and administrative systems." H.Rep. No. 1194, 91st Cong., 2d Sess., reprinted in 1970 U.S.Code Cong. & Admin.News 4104, 4109 (hereinafter House Report). The committee also noted that "where the federal government has authority with rail safety, it *preempts the field.*" House Report at 4108. (Emphasis added.)

The [FRSA] was the outgrowth of a report from a task force on railroad safety. The task force was primarily concerned with grade crossing accidents and derailments. *See* House Report, Appendix F, 4125, 4126–27. The task force noted the problems inherent in a hodgepodge of state safety regulations and concluded that "railroad safety ... requires a more comprehensive national approach." *Id.* at 4127. The task force recognized the potential tension between the need for increase speed and efficiency and the need for safety. *Id.* at 4128. One of its conclusions was that in order to obtain both higher speeds and increased safety, safer grade crossings and a better educated public were needed. *Id.* The task force concluded that "[t]he motoring public is part of the safety problem at the grade crossing." *Id.* The task force recommended, among other things, a set of "uniform procedures and standards" to regulate grade crossing. *Id.* at 4130.

*Easterwood,* 933 F.2d at 1552–53.

Like the Plaintiffs in the case at bar, Easterwood claimed the grade crossing accident at issue in *Easterwood* was caused because the train was traveling at a negligently high rate of speed. Witnesses estimated that the train speed was 32–50 m.p.h. on a section of track that, under the FRSA, had a maximum speed limit of 60 m.p.h. Easterwood argued that there was no pre-emption because (1) the speed limits were not adopted to minimize the number of grade crossing accidents and (2) compliance with a speed does not affect a finding of negligence.

As to the first argument, the court pointed to *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963), and said:

[I]t is irrelevant to pre-emption analysis whether the state law's objectives are similar to or different from the federal law's objectives. [*Florida Lime & Avocado Growers,* 373 U.S. at 142, 83 S.Ct. at 1217, 10 L.Ed.2d 248.] Pre-emption analysis turns on Congress' intent to pre-empt state law and on the nature of the federal regulations. The *Florida Lime & Avocado Growers* Court noted that a comparison of the similarities and divergences in the objectives of the federal and state regulations is simply a poor predictor of whether the federal regulations will pre-empt state law. *Id.* Moreover, Easterwood does not point to any legislative history for the speed limits and therefore she asks us to guess at the motives of the Secretary of Treasury. Such guessing is inherently suspect. While Easterwood assumes that the speed limits are designed to prevent derailments, it is equally valid to assume that the speed limits were set low enough that, in conjunction with adequate grade crossing signals and gates, the speed limits were intended to lessen the number of grade crossing accidents as well as lessen the chances of derailments.

*Easterwood,* 933 F.2d at 1554.

As to the second argument, the court stated:

Easterwood draws an analogy between compliance with the train speed limit and compliance with the national highway speed limit. *See* 23 U.S.C.A. § 154 (1990) Easterwood argues that an automobile driver's compliance with the 65 m.p.h. federal speed limit does not insulate a driver from liability. *See* Restatement (Second) of Torts § 288C (1965) ("Compliance with a legislative enactment ... does not prevent a finding of negligence where a reasonable [person] would take additional precautions.") If the train speed limits were not part of a comprehensive statute, perhaps, Easterwood's position would have merit. The code section governing highway speed limits does not directly overrule contrary state laws. This code section places conditions on the use of federal moneys. It therefore, only indirectly establishes uniformity. More importantly,

the train speeds are part of a statutory scheme which explicitly pre-empts state regulations covering the same subject matter. While Easterwood's argument is superficially persuasive, the fundamental differences in the statutory scheme and legislative histories of the two acts require us to find pre-emption in the case of train speed limits.

*Easterwood,* 933 F.2d at 1554.

Besides Plaintiffs' misplaced reliance on *Cipollone,* they cite no reason why the federal regulations should not pre-empt state law. The Plaintiffs cite numerous cases from other jurisdictions to support their position that negligence can be predicated upon a speed lower than the railroad's self-imposed speed limit. These cases, however, are unpersuasive as pre-emption by the FRSA was not discussed and the issue was never raised.

Plaintiffs urge us not to follow *Easterwood.* In their brief, Plaintiffs assert, "[T]he great weight of authority is contrary to its holding. In fact, the *Easterwood* case stands virtually alone in the case law on excessive railroad speed. Quite simply, it is an anomaly and, more precisely, bad law.... [T]he pre-emption analysis of the *Easterwood* court is flawed...." Despite Plaintiffs' assertions, they cite no authority that is contrary to *Easterwood.* In fact, in every reported case since *Easterwood* that we have been cited to or able to find that has dealt with the FRSA's pre-emption of state law concerning train speed limits, *Easterwood* has been followed. *See, e.g. Mahoney v. CSX Transp., Inc.,* 966 F.2d 644, 645 (11th Cir.1992) ("plaintiffs' claim that [the railroad] was negligent because the train was allegedly traveling too fast is preempted by federal law.... Because the [defendant's] train that struck [the plaintiff] was traveling below the maximum speed allowed under federal law, the plaintiffs may not attempt to establish [the defendant's] liability on the basis of the train's alleged excessive speed."); *Smith v. Norfolk & Western Ry. Co.,* 776 F.Supp. 1335, 1342 (N.D.Ind.1991) ("federal regulations governing the speed of trains preempts the plaintiffs' claim that [the defendant's] train was traveling at an excessive speed when it struck [the] vehicle."); *Grand Trunk*

*Western R.R. Co. v. City of Fenton,* 439 Mich. 240, 246, 482 N.W.2d 706, 708 (1992) ("We find Judge Johnson's opinion in *Easterwood* to be soundly reasoned and persuasive...."); *Central of Georgia R.R. Co. v. Markert,* 200 Ga.App. 851, 410 S.E.2d 437 (1991) ("jury would not be authorized to find that speed which was less than that authorized by the federal regulations was not a moderate and safe rate of speed."). For a case that predates *Easterwood* see *Sisk v. National R.R. Passenger Corp.,* 647 F.Supp. 861, 865 (D.Kan.1986) ("Because the [city] speed limit ordinance is void and unenforceable due to federal preemption, evidence of the ordinance, as well as the train's speed at the time of the accident, will be inadmissible for the purpose of showing the railroad's negligence.")

Plaintiffs also point to Tennessee Pattern Jury Instruction 6.66 for support. T.P.I.–Civil 6.66 states, "It is the duty of a railroad company to exercise reasonable care for the speed at which it operates its equipment at public highway crossings." Plaintiffs urge us not to take a "radical step" and "ignore and reject a well-established jury instruction which has been charged for decades."

In 1970, when T.P.I. 6.66 (then T.P.I. 6.46) was adopted, it was a correct statement of the law in this jurisdiction. Since then, however, the Secretary of Transportation has adopted rules concerning the speed limits of trains pursuant to the FRSA which pre-empt Tennessee law and thus make Rule 6.66 an incorrect statement of the law as it now exists.

Our holding on the first issue requires that the case be remanded for a new trial. This would eliminate the necessity of addressing the remaining issues in this opinion except for the potential of their being raised in the new trial. We will, accordingly, address each of them briefly.

■ Appellants' second and third issues say the court erred in allowing Plaintiffs' alleged expert witness, McAmis, to testify over objections as to prerogatives available to Southern's management and to criticize the design of Southern's train engine. The record shows Mr. McAmis was not qualified

as an expert witness. He was only a lay witness. Rule 701 of the Tennessee Rules of Evidence, as pertinent here, provides:

**Opinion testimony by lay witnesses.—(a)** Generally, If the witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences is limited to those opinions or inferences where:

(1) The opinions and inferences do not require a special knowledge, skill, experience, or training;

(2) The witness cannot readily and with equal accuracy and adequacy communicate what the witness has perceived to the trier of fact without testifying in terms of opinions or inferences; . . . .

Appellants' fourth issue insists they are entitled to a new trial because they were prejudiced by Plaintiffs' counsel's improperly asking Mr. McAmis if engineers always blew the whistle at crossings, to which he replied, "No."

Since the case is being remanded on other grounds, it is unnecessary to further address this issue.

■ The fifth issue is whether or not it *was error to allow portions of the Railroad Highway Crossing Handbook* to be placed into evidence as an exhibit.

Rule 618 of the Tennessee Rules of Evidence makes it clear that a treatise "may be used to impeach the expert witness's credibility but may not be received as substantive evidence." *See also McCay v. Mitchell,* 62 Tenn.App. 424, 463 S.W.2d 710, 720 (1970). Therefore, the excerpts from the handbook were properly used to impeach Plaintiffs' expert witness but such excerpts should not have been admitted as substantive evidence.

■ Southern asserts it was error to overrule its objection to the testimony of Linda Estes, a school bus driver. Ms. Estes testified she met with a representative of the "railroad" to discuss complaints about the excessive speed of trains at the crossing. Plaintiffs argue that Ms. Estes's testimony proves Southern was on notice of the "dangerous situation" at the crossing but did not do anything about it.

Nowhere in the record is it shown that the man with whom Ms. Estes met was from Southern. On cross-examination, Ms. Estes was asked how she knew the man was from the "railroad." She responded, "He told me so," but later acknowledged that she was not positive he worked for Southern. Furthermore, the testimony of another witness, Florence Kagley, made it apparent that the man with whom Ms. Estes met was actually from the Tennessee Department of Transportation. The record shows the Plaintiffs did not provide any evidence that the man with whom Ms. Estes met was from Southern. "Agency must be proved by the party asserting it and may not be proved solely by statements of the agent." *John J. Heirigs Constr. Co. v. Exide,* 709 S.W.2d 604, 608 (Tenn.App.1986). Since Plaintiffs did not show the man was an employee of Southern, any testimony by Ms. Estes regarding what was said to or by him is inadmissible hearsay.

Southern further claims the trial court was in error in declining to charge special requests for jury instructions.

■ Nowhere in the record, however, can we find where Southern made any request for special requests for jury instructions. In fact, immediately after charging the jury, the trial judge asked counsel if there were any requests for instructions and counsel for Southern responded, "I can't think of anything further, Your Honor." Objections to jury instructions are covered by Rule 51, TRCP. Under rule 51, in order to predicate error upon an alleged omission in instructions given to the jury, the person alleging error must have pointed out such omission to the trial judge at trial by an appropriate request for instructions. *Rule v. Empire Gas Corp.,* 563 S.W.2d 551, 553–554 (Tenn. 1978). Since the record does not show Southern made any request for instructions, it cannot now claim error.

Since the principal thrust of Plaintiffs' allegations of negligence of Defendants was excessive speed of the train, we think the error we found in the first issue more probably than not affected the judgment. The judgment of the trial court is reversed and the

case is remanded for a new trial. The cost of this appeal is taxed to the Appellees.

GODDARD and LEWIS, JJ., concur.