# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
May 21, 2013 Session

## CLAYTON WARD v. ILLINOIS CENTRAL RAILROAD COMPANY

**Direct Appeal from the Circuit Court for Shelby County**
**No. CT-006235-07      Jerry Stokes, Judge**

---

**No. W2012-01839-COA-R3-CV - Filed June 20, 2013**

---

Appellant, former employee of Appellee railroad, appeals the trial court's grant of Appellee's motion for summary judgment on the ground of preclusion. Appellant filed this lawsuit under the Federal Employers' Liability Act, seeking damages for injuries he allegedly suffered as a result of walking on ballast in Appellant's railyard. Appellee moved for summary judgment on the ground that Appellant's claim concerning ballast was precluded by the Federal Railroad Safety Act regulation 49 C.F.R. § 213.103. The trial court granted summary judgment, concluding that Appellant failed to meet his burden to negate Appellee's proof that it complied with 49 C.F.R. § 213.103. We have determined that Appellant satisfied his burden of production to negate Appellee's proof regarding whether the ballast rock at issue provided adequate drainage in compliance with 49 C.F.R. § 213.103, making summary judgment inappropriate. Reversed and remanded.

**Tenn. R. App. P. 3. Appeal as of Right; Judgment of the Circuit Court Reversed and Remanded**

J. STEVEN STAFFORD, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J.,W.S., and HOLLY M. KIRBY, J., joined.

Chester H. Lauck, III, Little Rock, Arkansas, for the appellant, Clayton Ward.

S. Camille Reifers and Brooks E. Kostakis, Memphis, Tennessee, for the appellee, Illinois Central Railroad Company.

## OPINION

### I.  Factual and Procedural History

This is the second appeal of this case. In ***Ward v. Illinois Central R. R. Co.***, No.

W2012-00950-COA-R9-CV, 2011 WL 255146 (Tenn. Ct. App. Jan. 20, 2011) ("***Ward I***"), this Court granted Appellee Illinois Central Railroad Company's ("ICRR") request for interlocutory appeal to address the question of whether Appellant Clayton Ward's claims were barred by the applicable three-year statute of limitations. The trial court denied ICRR's motion for summary judgment on the statute of limitations ground. In ***Ward I***, we affirmed the trial court, holding that there was a dispute of fact concerning when Mr. Ward discovered his injury, and that the trial court was correct in denying the railroad summary judgment at that time. A full recitation of the factual history of the case is set out in ***Ward I***. In the interest of continuity and judicial economy, we restate the relevant facts here:

> Clayton Ward . . . began working for Illinois Central Railroad Company . . . as a carman in April of 2003, when he was thirty years old. Initially, he worked inside a car shop, where he inspected and repaired train cars. After four to five months, however, he began working outside in the train yard, where he was required to walk along the length of the trains and inspect the railcars for defects.
>
> Toward the end of 2004, [Mr. Ward] began to experience swelling and pain in his left ankle. [Mr. Ward] could not recall any particular activity that he was engaged in when he first felt pain in his ankle. He said he had no "warning symptoms," but the pain gradually got worse every day for a couple of weeks. [Mr. Ward] described the pain and swelling as "mainly constant," and he said he did not get any relief from his symptoms at night. [Mr. Ward] said that his ankle would hurt worse when he walked on the ballast when inspecting trains, but that he had problems walking at home as well. He had no problems with his right ankle.
>
> After experiencing these symptoms for two to three weeks, [Mr. Ward] sought medical attention at Campbell Clinic in November 2004. An orthopedic surgeon diagnosed [Mr. Ward] with posterior tibial tendinitis. He gave [Mr. Ward] a "walking boot," ordered physical therapy, and placed him on medical leave from his employment. [Mr. Ward] was later told to discontinue physical therapy and to limit movement of his ankle. Thereafter, he was placed in an "Aircast" brace. In April of 2005, [Mr. Ward] was released from his physician's care and allowed to return to work. According to Plaintiff, his ankle

-2-

seemed to be fine at that point. Plaintiff passed a required medical examination and was determined to be qualified by Illinois Central's Medical Department, whose findings included a "normal [left] ankle [and] foot exam."

[Mr. Ward] was not placed under any work restrictions by his physician, but for whatever reason, when he returned to Illinois Central, he went to work inside the car shop again. He worked there for approximately two years until April of 2007, when he accepted a position in the train yard performing the same duties that he had previously performed there. Around June of 2007, [Mr. Ward] again began to experience pain and swelling in his left ankle. He was again diagnosed with posterior tibial tendinitis, and he underwent surgery in order to have his damaged tendon replaced in October 2007.

*Ward I*, 2011 WL 255146, at *1.

According to his deposition testimony, Mr. Ward described Johnston Yard as "where the trains come in and leave from," and further testified that his job as a carman in the yard required him to "walk and inspect each inbound and outbound train." Mr. Ward further stated that when he was assigned to a particular section of Johnston Yard, he was required to inspect any train that came in on any track in that section of the yard. As noted above, Mr. Ward began to experience pain and swelling in his left ankle, which he described as "mainly constant." When asked whether there were any particular activities that exacerbated his ankle pain, Mr. Ward stated in his deposition: "Just inspecting trains, walking on the ballast."

On December 17, 2007, Mr. Ward filed a complaint against Appellee Illinois Central Railroad Company ("ICRR"). The complaint, which was filed pursuant to the Federal Employers' Liability Act ("FELA"), 45 U.S.C. § 51 *et seq.*, alleged that, "[d]uring his tenure with [ICRR], [Mr. Ward] was negligently, in whole or in part, required and instructed by [ICRR] to work in unsafe working conditions that required him to walk for long periods of time on hard, uneven surfaces."[1] Mr. Ward alleged that these conditions "ultimately resulted

---

[1] 45 U.S.C.A. § 51 provides, in relevant part:

Every common carrier by railroad while engaging in commerce ... shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce, ... for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or

(continued...)

in a severe and permanently disabling cumulative trauma disorder to [Mr. Ward's] left ankle." ICRR filed its answer on February 21, 2008, generally denying the material allegations contained in the complaint, and asserting that Mr. Ward's claims were preempted or precluded by federal law. Mr. Ward was granted leave to amend his complaint to specify the amount of damages; the amended complaint was filed on March 20, 2008. The crux of Mr. Ward's complaint is that ICRR's use of ballast in its Memphis railyard, where Mr. Ward worked periodically from 2003 until 2007, was not reasonably safe. He alleges that his job duties as carman, which included walking alongside tracks on a ballast surface while inspecting trains, caused or contributed to his diagnosed condition of posterior tibial tendonitis in his left ankle in November of 2004, and subsequent surgery for that injury in February of 2007.

On March 28, 2012, ICRR filed a motion for summary judgment on the ground of federal preemption or preclusion of all claims asserted by Mr. Ward. In support of its motion, ICRR provided the affidavit of its Assistant Chief Engineer, Montie Chapman. In relevant part, Mr. Chapman testified that ICRR had complied with Federal Railroad Safety Act ("FRSA"), 49 C.F.R. § 213.103, *see* further discussion *infra*.

Specifically, Mr. Chapman testified that, during Mr. Ward's tenure with ICRR, ICRR used ballast in its operations. Mr. Chapman stated that the ballast: (1) transmits and distributes the load of the track and railroad rolling equipment to the subgrade; (2) restrains the track laterally, longitudinally, and vertically under dynamic loads imposed by railroad equipment and thermal stress exerted by the rails; (3) provides adequate drainage for the track; and (4) maintains proper track crosslevel, surface and alignment.

On April 27, 2012, Mr. Ward filed a response in opposition to ICRR's motion for summary judgment. The motion was heard by the trial court on May 4, 2012. By Order of May 23, 2012, the trial court granted ICRR's motion for summary judgment. The trial court's order states, in relevant part, that:

> This matter came to be heard on May 4, 2012, on [ICRR's] Motion for Summary Judgment based on federal preemption. The Court has fully considered the pleadings, the affidavit of

---

[1](...continued)
      employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment.

Montie Chapman, the authorities submitted by the parties, the arguments of counsel, the entire record in this cause, and the Sixth Circuit's holding in *Nickels v. Grand Trunk Western R.R., Inc.*, 560 F.3d 426 (6th Cir. 2009). The Court finds that there are no material facts in dispute concerning the preemption of [Mr. Ward's] claims in this action, and that [ICRR's] motion should be granted.

The Court finds that the Federal Railroad Safety Act (FRSA) regulation 49 C.F.R. § 213.103 substantially subsumes the area of requirements as to ballast size, and that [Mr. Ward's] allegations in this action brought pursuant to the Federal Employers' Liability Act (FELA) are preempted. The Court specifically finds that the subject matter of the lawsuit, the ballast utilized by . . . Illinois Central Railroad Company in areas where Clayton Ward worked, primarily in Johnston Yard (currently known as Harrison Yard) in Memphis, Tennessee, is preempted by the FRSA and federal law.

On June 19, 2012, Mr. Ward filed a motion to alter or amend the judgment, which motion was opposed by ICRR. A hearing on the motion to alter or amend was held on July 20, 2012. By order of July 30, 2012, the trial court denied Mr. Ward's motion.

## II. Issues

Mr. Ward appeals; he raises two issues for review as stated in his brief:

1. Did the trial court err in granting summary judgment in favor of [ICRR] on the basis of federal preemption?

2. Did the trial court err in denying [Mr. Ward's] motion to alter or amend the order granting [ICRR's] motion for summary judgment based on federal preemption?

## III. Standard of Review

A motion for summary judgment should be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04. "The party seeking the summary

judgment has the burden of demonstrating that no genuine disputes of material fact exist and that it is entitled to a judgment as a matter of law." *Green v. Green*, 293 S.W.3d 493, 513 (Tenn. 2009) (citing *Martin v. Norfolk S. Ry.*, 271 S.W.3d 76, 83 (Tenn. 2008); *Amos v. Metro. Gov't of Nashville & Davidson County*, 259 S.W.3d 705, 710 (Tenn. 2008)).

"A moving party who seeks to shift the burden of production to the nonmoving party who bears the burden of proof at trial must either: (1) affirmatively negate an essential element of the nonmoving party's claim; or (2) show that the nonmoving party cannot prove an essential element of the claim at trial." *Hannan v. Alltel Publ'g Co.*, 270 S.W.3d 1, 9 (Tenn. 2008) (footnote omitted).[2] "It is not enough for the moving party to challenge the nonmoving party to 'put up or shut up' or even to cast doubt on a party's ability to prove an element at trial." *Id*. at 8. If the moving party makes a properly supported motion, the burden of production shifts to the nonmoving party to establish the existence of a genuine issue of material fact. *Byrd v. Hall*, 847 S.W.2d 208, 215 (Tenn. 1993).

The resolution of a motion for summary judgment is a matter of law, which we review *de novo* with no presumption of correctness. *Martin*, 271 S.W.3d at 84. However, "we are required to review the evidence in the light most favorable to the nonmoving party and to draw all reasonable inferences favoring the nonmoving party." *Id*. (citing *Staples v. CBL & Assocs., Inc.*, 15 S.W.3d 83, 89 (Tenn. 2000)).

The material facts in the instant case are undisputed. The sole question is whether Mr. Ward's claims, filed under the FELA, are precluded by the FRSA. This inquiry is a question of law that is subject to *de novo* review on appeal. *Leggett v. Duke Energy Corp.*, 308 S.W.3d 843, 851 (Tenn. 2010) (quoting *Friberg v. Kan. City S. Ry. Co.*, 267 F.3d 439, 442 (5th Cir. 2001)).

### IV. Railway Safety Regulation Preemption/Preclusion History

We begin our analysis with a semantic distinction that is often confused in our caselaw—that is, the distinction between preemption and preclusion. As noted in Joseph Mark Miller, *Federal Preemption & Preclusion: Why the Federal Railroad Safety Act Should Not Preclude the Federal Employer's Liability Act*, 51 Loy. L.Rev. 947, n.7 (Winter 2005), "preemption" occurs when federal law bars state law. "Preclusion" occurs when one federal law bars another federal law. Mr. Miller goes on to explain:

---

[2] Recently, the Tennessee General Assembly enacted a new law that modified the summary judgment standard in Tennessee. *See* Tenn. Code Ann. § 20-16-101. However, the statute applies only to cases filed on or after July 1, 2011. Thus, in this appeal, we apply the summary judgment standard set forth in *Hannan*.

The source of the preemption doctrine is most often attributed by scholars to the Supremacy Clause of the Constitution, which declares that the laws of the United States shall be the supreme law of the land. U.S. Const. art. VI, cl. 2. Express preemption occurs when a federal statute explicitly excludes state regulation in a particular area. Field preemption occurs when a federal regulation is so "pervasive" that courts infer that Congress intended to occupy the field entirely and exclude all state law. Finally, conflict preemption occurs when a federal regulation conflicts with a state law, which is "overridden."

*Id*. at n.6 (internal citations omitted).

It is well settled that a federal regulation adopted pursuant to the FRSA preempts any state "law, rule, regulation, order or standard relating to railroad safety" that covers the same subject matter as the federal regulation. 49 U.S.C.A. § 20106(a)(2). This includes state tort claims. ***CSX Transp., Inc. v. Easterwood***, 507 U.S. 658, 664 (1993); ***Emery v. Southern Ry. Co.***, 866 S.W.2d 557, 561 (Tenn. Ct. App. 1993). In the instant case, however, the question is not whether state law is preempted by the federal law, but rather, whether the FELA is precluded by the federal regulations set forth in the FRSA.

In order to answer this question, we begin with a discussion of the relevant caselaw dealing with questions of preemption and/or preclusion by passage of railroad safety regulations. In ***CSX Transp., Inc. v. Easterwood***, 507 U.S. 658, 664 (1993), the United States Supreme Court stated, in relevant part:

FRSA was enacted in 1970 "to promote safety in all areas of railroad operations and to reduce railroad-related accidents, and to reduce deaths and injuries to persons...." 45 U.S.C. § 421. To aid in the achievement of these goals, the Act specifically directs the Secretary of Transportation to study and develop solutions to safety problems posed by grade crossings. § 433. In addition, the Secretary is given broad powers to "prescribe, as necessary, appropriate rules, regulations, orders, and standards for all areas of railroad safety . . . ." § 431(a). The pre-emptive effect of these regulations is governed by § 434, which contains express saving and pre-emption clauses. Thus, the States are permitted to "adopt or continue in force any law, rule, regulation, order, or standard relating to railroad safety until such time as the

Secretary has adopted a rule, regulation, order, or standard covering the subject matter of such State requirement." Even after federal standards have been promulgated, the States may adopt more stringent safety requirements "when necessary to eliminate or reduce an essentially local safety hazard," if those standards are "not incompatible with" federal laws or regulations and not an undue burden on interstate commerce.

*CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 661-62 (1993) (footnote omitted). The *Easterwood* Court further noted that "[a]ccording to § 434, applicable federal regulations may pre-empt any state 'law, rule, regulation, order, or standard relating to railroad safety.' Legal duties imposed on railroads by the common law fall within the scope of these broad phrases." *Id*. at 664.

In analyzing the railroad's preemption argument concerning plaintiff's common law claim based upon the alleged speed of the train, the *Easterwood* Court noted that train speed had specifically been addressed by the Secretary of Transportation and corresponding regulations that covered the subject matter at issue, to wit:

> Federal regulations issued by the Secretary pursuant to FRSA and codified at 49 CFR § 213.9(a) (1992) set maximum allowable operating speeds for all freight and passenger trains for each class of track on which they travel. The different classes of track are in turn defined by, *inter alia*, their gage, alignment, curvature, surface uniformity, and the number of crossties per length of track. See §§ 213.51-213.143. The track at the Cook Street crossing is class four, for which the maximum speed is 60 miles per hour. Although respondent concedes that petitioner's train was traveling at less than 60 miles per hour, she nevertheless contends that petitioner breached its common-law duty to operate its train at a moderate and safe rate of speed. *See, e.g.*, *Central of Georgia R. Co. v. Markert*, 200 Ga.App. 851, 852, 410 S.E.2d 437, 438, cert. denied, 200 Ga.App. 895 (1991). Petitioner contends that this claim is pre-empted because the federal speed limits are regulations covering the subject matter of the common law of train speed.
>
> On their face, the provisions of § 213.9(a) address only the maximum speeds at which trains are permitted to travel given the nature of the track on which they operate. Nevertheless,

related safety regulations adopted by the Secretary reveal that the limits were adopted only after the hazards posed by track conditions were taken into account. Understood in the context of the overall structure of the regulations, the speed limits must be read as not only establishing a ceiling, but also precluding additional state regulation of the sort that respondent seeks to impose on petitioner.

*Easterwood*, 507 U.S. at 673–74 (footnote omitted). Accordingly, the *Easterwood* Court concluded that the plaintiff's excessive speed claim "cannot stand in light of the Secretary's adoption of the regulation in § 213.9," and held that "federal regulations adopted by the Secretary of Transportation pre-empt respondent's negligence action only insofar as it asserts that petitioner's train was traveling at an excessive speed." *Id*.

Likewise, in the case of *Norfolk Southern Ry. Co. v. Shanklin*, 529 U.S. 344 (2000), the Supreme Court again addressed the question of claim preemption in the context of railway safety regulations dealing with railroad crossings. In *Shanklin*, the plaintiff, widow of the decedent who was killed in a railway crossing accident, brought her case in the Tennessee state court. Specifically, plaintiff alleged that the defendant railroad had failed to maintain adequate warning devices at the grade crossing. The Supreme Court ultimately held that "the FRSA pre-empts respondent's state tort claim that the advance warning signs and reflectorized crossbucks installed at the. . .crossing were inadequate." *Id*. at 358–59. In so ruling, the Supreme Court discussed the express preemption provision of the FRSA, 49 U.S.C. § 20106, and the subsequent enactment by Congress of the Highway Safety Act and creation of the Federal Railway-Highway Crossing Program. *Id*. at 352–55. Through the Federal Highway Administration ("FHWA"), the Secretary of Transportation promulgated several regulations implementing the crossings program that addressed the design of crossing improvements. *Id*. Applying *Easterwood* and other applicable precedent concerning preemption, the Court held that because the Tennessee Department of Transportation had used federal funds for the installation of advance warning signs and reflectorized crossbucks (which plaintiff had alleged were inadequate), specific regulations of the FHWA governed the selection and installation of the devices. Therefore, once the installation project was approved by the FHWA and the signs were installed using federal funds, "the federal standard for adequacy displaced Tennessee statutory and common law addressing the same subject, thereby pre-empting respondent's claim." *Id*. at 358–59. Accordingly, the preemption provision of the FRSA was applied to preempt the plaintiff's state claims alleging inadequate crossing devices.

In *Waymire v. Norfolk & Western Railway Co.*, 218 F.3d 773, 774 (7th Cir. 2000), a train was involved in an accident with a truck at a railroad crossing. One of the railroad's

employees claimed he was injured and sued the railroad, alleging that it was negligent in allowing the train to travel at an unsafe speed and in failing to install additional warning devices at the railroad crossing. *Id*. However, the train was traveling well below the speed limit set by FRSA regulations, and the crossing was equipped with warning devices that were installed and approved in accordance with FRSA regulations. *Id*. The Seventh Circuit concluded that "in order to uphold FRSA's goal of uniformity," the employee's FELA negligence claims should be superseded by the FRSA regulations. *Id*. at 776. Specifically, the *Waymire* Court stated:

> We are persuaded by the Supreme Court's reasoning [in *Easterwood*] and find that in order to uphold FRSA's goal of uniformity we must strike the same result. *See* 49 U.S.C. § 20106 ("Laws, regulations, and orders related to railroad safety shall be nationally uniform to the extent practicable."). In *Easterwood*, the train was operating within the FRSA prescribed 60 miles per hour speed limit, as was N & W's train in this case. It would thus seem absurd to reach a contrary conclusion in this case when the operation of both trains was identical and when the Supreme Court has already found that the conduct is not culpable negligence.

> We are not alone in our conclusion. Of the other courts who have been presented with the issue as it relates to FELA and FRSA, two have held that the FELA plaintiff's unsafe speed claim cannot stand in light of the Secretary's adoption of the speed regulations in 49 C.F.R. Pt. 213. *See Rice v. Cincinnati, New Orleans & Pacific Railway Company*, 955 F.Supp. 739, 740-41 (E.D. Ky. 1997) and *Thirkill v. J.B. Hunt Transport, Inc.*, 950 F. Supp. 1105, 1107 (N.D. Ala. 1996). Only one other court has reached the opposite result. See *Earwood v. Norfolk Southern Railway Company*, 845 F. Supp. 880 (N.D. Ga. 1993). We believe the former result to be the correct result in light of FRSA's goal of uniformity and the Supreme Court's holding in *Easterwood* and thus hold that Waymire's negligence claim based upon the speed of the train is superseded by FRSA and the regulations promulgated thereunder. The judgment of the District Court is affirmed in this regard.

*Waymire*, 218 F.3d at 776; *accord Lane v. R.A. Sims, Jr., Inc.*, 241 F.3d 439, 443–44 (5th Cir. 2001); *Dickerson v. Staten Trucking, Inc*., 428 F.Supp.2d 909, 914 (E.D. Ark. 2006);

***In re: Amtrak "Sunset Limited" Train Crash in Bayou Canot, Ala., on Sept. 22, 1993***, 188 F.Supp.2d 1341, 1348-49 (S.D. Ala.2000); ***Rice v. Cincinnati, New Orleans, & Pac. Ry. Co.***, 955 F.Supp. 739, 741 (E.D. Ky.1997). However, as noted by the ***Waymire*** Court, other courts have reached the opposite conclusion, holding that FELA claims are not preempted or precluded by FRSA regulations. *See, e.g.*, ***Earwood v. Norfolk S. Ry. Co.***, 845 F.Supp. 880, 885 (N.D. Ga. 1993) ("The Court concludes that Plaintiff's FELA claims are not precluded by FRSA. The two statutes do not purport to cover the same areas . . . . Neither the FRSA nor the regulations purport to define the standard of care with which railroads must act with regard to employees."); *see further* ***Myers v. Ill. Cent. R.R. Co.***, 323 Ill.App.3d 780, 257 Ill.Dec. 365, 753 N.E.2d 560, 565 (Ill. Ct. App. 2001) ("If Congress had intended FRSA to abolish FELA remedies for railroad employees, we believe Congress would have said so explicitly."). Thus, the ***Waymire*** holding that FELA negligence claims can be precluded when a railroad is in compliance with FRSA regulations is by no means universally adopted. *See* Joseph Mark Miller, *Federal Preemption & Preclusion: Why the Federal Railroad Safety Act Should Not Preclude the Federal Employer's Liability Act*, 51 Loy. L.Rev. 947 (Winter 2005) (discussing cases). However, the majority of cases decided since ***Easterwood*** have consistently held that the preemptive and/or preclusive effect of federal railroad safety regulations is applicable where the FRSA regulation "'substantially subsume[s]' the subject matter of the suit." ***Nickles v. Grand Truck Western R.R., Inc.***, 560 F. 3d 426, 429 (6ᵗʰ Cir. 2009) (citing ***Easterwood***, 507 U.S. at 664)). The question, then, is whether the specific FRSA regulation concerning ballast, 49 C.F.R. § 213.103, "substantially subsumes" the subject matter of Mr. Ward's lawsuit. We now turn to address that question.

## **V.  *Nickels v. Grand Trunk Western R. R., Inc.*, 560 F.3d 426 (6th Cir. 2009).**

In ***Nickels v. Grand Trust Western R. R., Inc.***, 560 F.3d 426 (6th Cir. 2009), the Sixth Circuit explicitly held that a federal regulation promulgated by the Secretary of Transportation "substantially subsumes the issue of ballast size." *Id*. at 430. Accordingly, the Sixth Circuit affirmed the District Court's decision to enter summary judgment against railroad employees who brought claims under the FELA, alleging injuries sustained from years of walking on "oversized" ballast. As in the instant case, in *Nickels*, the plaintiffs claimed that the railroad failed to provide a safe working environment when it used large mainline ballast, rather than smaller yard ballast underneath and adjacent to tracks receiving heavy foot traffic.[3] *Id*. at 428. The defendant railroad moved for summary judgment on the ground of preemption under the FRSA. The District Court granted the railroad's motion, concluding that to allow the plaintiffs to maintain their FELA claims would undermine the

---

[3] As explained by the *Nickels* Court, "[t]rack ballast is the stone or other material placed underneath and around railroad tracks to provide the structural support, drainage, and erosion protection necessary for safe rail travel." *Nickels*, 560 F.3d at 428.

FRSA's express intent to achieve national uniformity in railroad safety regulations. *Id.* On appeal, the Sixth Circuit applied a *de novo* review to the District Court's ruling. The Court noted that the case required it to examine the interplay between two federal statutes, both of which were designed to promote railway safety, the FELA and the FRSA. *Id*. The Sixth Circuit cited the FRSA's preemption provision, providing that a plaintiff can bring an action under state law unless the Secretary of Transportation has prescribed a regulation or issued an order "covering the subject matter of the State requirement." *Id*. at 430 (citing 49 U.S.C. § 20106). The *Nickels* Court recognized that: "A state-law negligence action is 'covered' and therefore preempted if a FRSA regulation 'substantially subsume[s]' the subject matter of the suit." *Nickels*, 560 F.3d at 429. The Sixth Circuit then noted that the Secretary has promulgated 49 C.F.R. § 213.103 on ballast. This is the same regulation that is at issue in the instant case; it provides:

> Unless it is otherwise structurally supported, all track shall be supported by material which will --
>
> (a) Transmit and distribute the load of the track and railroad rolling equipment to the subgrade;
> (b) Restrain the track laterally, longitudinally, and vertically under dynamic loads imposed by railroad rolling equipment and thermal stress exerted by the rails;
> (c) Provide adequate drainage for the track; and
> (d) Maintain proper track crosslevel, surface, and alignment.

In relevant part, the *Nickels* Court noted that, "[r]ather than prescribing ballast sizes for certain types or classes of track, the regulation leaves the matter to the railroads' discretion so long as the ballast performs the enumerated support functions." *Nickels*, 560 F.3d at 431. The *Nickels* Court further concluded that "the regulation substantially subsumes the issue of ballast size." *Id*. Accordingly, the Sixth Circuit held that "in § 213.103 the Secretary has directed railroads to install ballast sufficient to perform key support functions under the conditions applicable to the track. . . . The regulation thus determines what is a reasonable ballast composition and size for a particular track." *Id*.

As discussed above, the *Nickels* Court undisputedly held that ballast related claims are covered, i.e., preempted or precluded by FRSA regulation 49 C.F.R. § 213.103. In his brief, Mr. Ward devotes a majority of his argument to persuade this Court to deviate from the Sixth Circuit's holding in *Nickels*. After considering his arguments, we respectfully decline to do so. Despite Appellant's argument that the reasoning in *Nickels* is flawed, it is beyond dispute that Tennessee has adopted the *Nickels* analysis in cases involving the defense of preclusion or preemption of claims brought by FELA plaintiffs. In *Melton v.*

*BNSF Railway Co*., 322 S.W.3d 174 (Tenn. Ct. App. 2010), this Court stated:

> The Sixth Circuit Court of Appeals has recently held that, "the uniformity demanded by the [Federal Railway Safety Act, 49 U.S.C. § 20101, et seq. ("FRSA") ] can be achieved only if federal rail safety regulations are applied similarly to a FELA plaintiff's negligence claim...." *Nickels v. Grand Trunk Western R.R., Inc.*, 560 F.3d 426, 430 (6th Cir.2009)(citing *Lane v. R.A. Sims, Jr., Inc.*, 241 F.3d 439, 443 (5th Cir.2001); and *Waymire v. Norfolk & W. Ry. Co.*, 218 F.3d 773, 776 (7th Cir.2000)). Thus, if there is a federal regulation prescribed under FRSA, plaintiff's claims are preempted. As noted by the Nickels court, the Secretary of Transportation has promulgated a regulation on ballast and, therefore, negligence claims based on ballast may be preempted. *Id*. (citing 49 C.F.R. § 213.103). Similarly, there is also a regulation under FRSA on vegetation and claims based on vegetation consequently, may also be preempted. *See* 49 C.F.R. § 213.37.
>
> However, to be preempted the railroad must be in compliance with the federal regulations. *Michael v. Norfolk Southern Ry. Co.*, 74 F.3d 271, 273 (11th Cir.1996). If the railroad is not in compliance, then the claim is not preempted. *Id*. While preemption is a question of law, *Nickels*, 560 F.3d at 429, whether the railroad was complying with the federal regulation at issue is a question of fact. *Id*.

*Melton,* 322 S.W.3d at 190.  In *Melton*, this Court reversed the grant of summary judgment in favor of the railroad on the ground of preemption because the defendant had "not affirmatively shown that it was in compliance with the federal regulations." *Id*. at 190. We will address the question of whether there is any dispute within the record concerning whether ICRR complied with 49 C.F.R. § 213.103 below.  However, before turning to that question, we first address Mr. Ward's argument that the *Nickels* holding is inapplicable to his particular claims.

## VI.  Whether Mr. Ward's Ballast Claims are Distinguishable from the *Nickels* Claims

Mr. Ward argues that 49 C.F.R. § 213.03, "on its face, does not require the use of ballast in rail yard areas or mention the safety of walking surfaces for railroad employees." Although we concede that some courts outside of Tennessee and the Sixth Circuit have found the *Nickels* analysis to be distinguishable based on the use of "mainline" ballast and "yard"

-13-

ballast, as noted above, the **Nickels** Court explicitly held that "the regulation [i.e., 49 C.F.R. § 213.03] substantially subsumes the issue of ballast size," and that "in § 213.03 the Secretary has directed railroads to install ballast sufficient to perform key support functions under the conditions applicable to the track . . . . The regulation thus determines what is a reasonable ballast composition and size for a particular track." **Nickels**, 560 F.3d at 431. It is undisputed in the record that the track in the Johnston Yard, where Mr. Ward worked from 2004 until 2007, used ballast in its operations to perform the essential functions contemplated by the FRSA at 49 C.F.R. § 213.103. Although Mr. Ward urges this Court to conclude that walkways and ballast are distinguishable in a railyard, in the instant case, this is a distinction without a difference. As Mr. Ward states in his deposition, "the yard is the tracks." In other words, carmen are required to walk the tracks themselves, which are supported by ballast. The ballast, therefore, are the walkways. At oral argument, Mr. Ward's attorney couched Mr. Ward's claim as "whether walkways are covered" under the federal regulation. He further stated that "walkways are distiguish[able] from ballast." As a hypothetical, Mr. Ward's attorney stated that, under the **Nickels** holding, "anywhere [ICRR] put ballast rock [e.g., inside its offices] would be precluded under [the FRSA, 49 C.F.R.§ 213.103]." Although Mr. Ward's counsel makes a cogent argument, we are not persuaded that simply putting ballast materials (e.g., rock) in a location, *ipso facto*, makes that location a ballast (i.e., a support structure for a rail line). Rather, it is clear from our review of the record that Mr. Ward's claims arise from the composition, or type of ballast employed for use in ICRR's Johnston Yard. By his own testimony, Mr. Ward states that his injuries were caused by his work "inspecting trains, walking on the ballast." In short, the crux of Mr. Ward's claim is that he was injured by walking on ballast in the yard. These types of claims have been found to be encompassed within the Sixth Circuit's holding in **Nickels**. For example, in **Munns v. CSX Transp., Inc.**, No. 3:07CV2507, 2009 WL 805133 (N.D. Ohio Mar. 27, 2009), the United States District Court for the Northern District of Ohio summarized that plaintiff's claims as follows:

> Plaintiff claims that CSX used "mainline"-i.e., larger-ballast in areas of the Willard yard and elsewhere where it could have used smaller "yard" ballast to support its track, provide drainage and fulfill the other functions for which ballast is employed. The gravamen of plaintiff's contention about unsuitable ballast appears to be that mainline ballast, being bigger, creates a more uneven surface, is more difficult to walk upon and creates more physical stress than the smaller yard ballast.

**Munns**, 2009 WL 805133 at *3. In **Munns**, the District Court was unpersuaded by plaintiff's attempt to avoid the railroad defendant's preclusion defense, to wit:

-14-

Under the Federal Railway Safety Act [FRSA], 49 U.S.C. § 20101 et seq., the Secretary of Transportation has adopted a regulation relating to ballast. 49 C.F.R. § 213.103. Rejecting contentions similar to those made here by the plaintiff that the regulation does not preempt ballast-related FELA claims, the Sixth Circuit held in *Nickels v. Grand Trunk Western R.R.*, Inc.., 560 F.3d 426, ---- 2009 WL 691040, *6 (6th Cir.), that "[b]ecause 49 C.F.R. § 213.103 covers the issue of ballast size . . . [it] precludes the plaintiffs' FELA claims."

*Munns*, 2009 WL 805133, at *3 (footnote omitted). Rather, the *Munns* Court reiterated the holding in *Nickels*: "*Nickels* holds that the FRSA is preemptive as to **claims of individual injury from using ballast in areas where railway employees will be walking**." *Id*. at *4 (emphasis added); *see also* *Kresel v. BNSF Ry. Co.*, No. 09-CV-2861, 2011 WL 1456766, at *8 (D. Minn. April 15, 2011) (noting that the controlling factor in determining preemption under the FRSA is the undisputed fact that the plaintiff was standing immediately adjacent to the track and upon the ballast that was serving the functions of 49 C.F.R. § 213.103).

In the recent case of *Brenner v. Consolidated Rail Corp*, 806 F. Supp. 786 (E.D. Penn. April 18, 2011), the District Court addressed a claim that is nearly identical to that averred by Mr. Ward. In *Brenner*, the plaintiff's claimed cumulative trauma injury to his knees from walking on ballast in a rail yard. The District Court found plaintiff's claims were precluded by FRSA regulation 29 C.F.R. § 213.103. The *Brenner* Court examined the evidence in light of the *Nickels* holding, and determined that the railroad employee, similar to Mr. Ward's claim in the instant case, alleged that his cumulative trauma injuries were caused by "walking on uneven or unleveled ballast." *Brenner*, 806 F. Supp. at 795. The court noted that plaintiff's claims related almost entirely to track ballast. *Id*. at 796. Ultimately, the *Brenner* Court held that "to the extent that Plaintiff's claims are predicated upon allegations of negligence regarding the **nature** and size of ballast used for track stability, support, and drainage—including mainline, secondary **and yard track**—such claims are precluded by 49 C.F.R. § 213.103." *Id*. (emphases added). Likewise, in the instant case, it is undisputed that Mr. Ward's claims relate to injuries he allegedly sustained as a result of the nature (i.e., design, orientation, size, levelness) of the ballast used by ICRR in its Johnston Yard. Accordingly, under the foregoing authority, if there is no dispute as to whether ICRR complied with 49 C.F.R. § 213.103, Mr. Ward's claims are precluded by the FRSA regulation. We now turn to address that question.

## VII. Burden Shifting

As discussed by the *Melton* Court, "to be preempted the railroad must be in

compliance with the federal regulations." ***Melton,*** 322 S.W.3d at 190 (citation omitted). "If the railroad is not in compliance, then the claim is not preempted." ***Id***. (citation omitted). While preemption is a question of law, ***Nickels***, 560 F.3d at 429, whether the railroad was complying with the federal regulation at issue is a question of fact. ***Id***.

As discussed above, when a motion for summary judgment is made, the moving party has the burden of showing that "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Tenn. R. Civ. P. 56.04. The moving party may accomplish this by either: (1) affirmatively negating an essential element of the non-moving party's claim; or (2) showing that the non-moving party will not be able to prove an essential element at trial. ***Hannan v. Alltel Publ'g Co.***, 270 S.W.3d 1, 8–9 (Tenn. 2008). However, "[i]t is not enough for the moving party to challenge the nonmoving party to 'put up or shut up' or even to cast doubt on a party's ability to prove an element at trial." ***Id***. at 8.

Turning to the record, in support of its motion for summary judgment, ICRR submitted the affidavit of Montie Chapman, ICRR's Assistant Chief Engineer. In relevant part, Mr. Chapman testified:

> I have been an employee of [ICRR] since 1977. . . .
>
> 2. The statements contained in this Affidavit are based upon my personal knowledge. I am competent to testify to the matters herein based on my training and experience, and my knowledge and understanding of maintenance and safety practices and protocols at [ICRR].
>
> 3. At all times during Clayton Ward's employment at Illinois Central, Illinois Central utilized ballast in its operations . . . . The ballast utilized by Illinois Central is in compliance with federal regulation 49 C.F.R. § 213.103.

From his affidavit, it is undisputed that, based on his position with ICRR, Mr. Chapman is qualified to testify as to ICRR's compliance with the ballast requirements contained in 49 C.F.R. § 213.103, including the requirement that the ballast provide adequate drainage.[4] His testimony is based upon his personal knowledge of railroad operations, as

_____

[4] In the trial court, Mr. Ward objected to the use of Mr. Chapman's affidavit to shift the burden of production on the ground that Mr. Chapman was not disclosed as an expert pursuant to Rule 26.02 of the Tennessee Rules of Civil Procedure. In addition, Mr. Ward argued that ICRR failed to disclose any
(continued...)

well as his familiarity with maintenance and safety practices. Accordingly, Mr. Chapman's affidavit effectively shifted the burden of production to Mr. Ward. Because ICRR's summary judgment motion was properly supported, "[t]he burden of production then shifts to the nonmoving party to show that a genuine issue of material fact exists." **Hannan v. Alltel Publ'g Co.**, 270 S.W.3d at 5. The non-moving party may accomplish this by: "(1) pointing to evidence establishing material factual disputes that were overlooked or ignored by the moving party; (2) rehabilitating the evidence attacked by the moving party; (3) producing additional evidence establishing the existence of a genuine issue for the trial; or (4) submitting an affidavit explaining the necessity for further discovery pursuant to Tenn. R. Civ. P. 56.06." **Martin v. Norfolk S. Ry. Co.**, 271 S.W.3d 76, 84 (Tenn. 2008) (citations omitted).

In response to Mr. Chapman's testimony that ICRR complied with the FRSA regulation, Mr. Ward proferred the deposition testimonies of his co-workers Gene Bolden, Steven Wells, and Brent Hussey for the proposition that ICRR had not fully complied with the mandates of 49 C.F.R. § 213.103. Messrs. Bolden, Wells, and Hussey are (or were) employed by ICRR as carmen, which is the same position that Mr. Ward held.

In relevant part, Mr. Bolden testified:

Q. Did you have any difficulties performing your job as a carman in the rail yards from '97 to 2006?

A. Yes.

Q. Would you describe those for me, sir?

A. The ballast situation had not changed. The trains, the volume of trains that came in and out of the Johnston Yard at this time were—were large. We had debris in the yard. We had track repairs that were made that were not finished up. We had

---

[4](...continued)
information regarding Mr. Chapman's "experience, training, background, expected area of testimony, or opinions." Despite this argument, the trial court relied on the affidavit of Mr. Chapman in granting the motion for summary judgment. From our review of Mr. Ward's brief, he has apparently abandoned the claim that Mr. Chapman's affidavit was inadmissible to shift the burden of production. *See Doe A v. Coffee County Bd. of Educ.*, 925 S.W.2d 534, 536 n.6 (Tenn. Ct. App. 1996) (citing *Maryville Housing Authority v. Ramsey*, 484 S.W.2d 73 (Tenn. Ct. App. 1972)). Accordingly, we will consider Mr. Chapman's affidavit as competent evidence that ICRR complied with the ballast requirements in 49 C.F.R. § 213.103.

standing water. . .

*                                    *                                    *

Q.  Okay.  So it's fair to say as we sit here today you have testified that several times between 1997 and 2006 you saw debris and had to walk around it in the yard, but you cannot testify how many times particularly you had an issue with debris in the yard, correct?

A.  Yes.

*                                    *                                    *

Q.  You indicated that there was a problem with standing water. Where was that, sir?

A.  In C yard.

Q.  And during which time period was that an issue?

A.  From about mid spring to middle of summer and then anytime it came a real bad rain, water would stand in the train yards.

Q.  During which years?

A.  All years.

Mr. Bolden further stated that he had never filed a complaint with ICRR regarding the alleged standing water, but did state that one purpose of the ballast was to ensure proper drainage. By his testimony, Mr. Bolden admitted that he never observed Mr. Ward while he was working and that he and Mr. Ward worked at different locations along the track. Testimony of Messrs. Wells and Hussey further established that there was debris on the ballast and that the ballast used by ICRR made it difficult to walk.

Mr. Ward argues that Mr. Bolden's testimony meets his burden to establish a dispute of material fact as to whether the ballast at issue "[p]rovide[d] adequate drainage for the track" in compliance with 49 C.F.R. § 213.103. We agree. Taking all reasonable inferences in Mr. Ward's favor, as we must at this stage in the litigation, we conclude that Mr. Bolden's

-18-

testimony creates an issue of material fact as to whether the ballast in place at ICRR provided adequate drainage in compliance with federal regulations. *See **Giggers v. Memphis Hous. Auth.***, 277 S.W.3d 359, 364 (Tenn. 2009) (holding that in ruling on a motion for summary judgment, "[c]ourts must view the evidence and all reasonable inferences therefrom in the light most favorable to the non-moving party"). The federal regulation clearly requires that the ballast "[p]rovide adequate drainage for the track." 49 C.F.R. § 213.103. Mr. Chapman, in his affidavit, stated that the ballast met this requirement. To undermine this proof, Mr. Ward offered the testimony of Mr. Bolden, who testified that the ballast in place in at least a portion of the yard allowed water to stand for a significant portion of the year, every year, and every time there was significant precipitation. This testimony, taken in the light most favorable to Mr. Ward, and drawing all reasonable inferences in his favor, creates a dispute of material fact as to whether the ballast in place was, in fact, providing adequate drainage for the yard, and therefore, whether ICRR was indeed complying with 49 C.F.R. § 213.103.

ICRR takes issue, however, with the fact that the evidence submitted by Mr. Ward was not expert testimony, but instead came from a lay witness who was not established as an expert on the use and maintenance of ballast and track. Rather, as noted above, Mr. Bolden, like Mr. Ward, was a carmen, charged with knowledge of mechanical repairs to railcars as opposed to the track system. This is a problem that the trial court noted at the hearing on the motion for summary judgment:

> THE COURT: So you [i.e., Mr. Ward's attorney] want me to consider your lay witnesses [i.e., Messrs. Bolden, Wells, and Hussey] on the appropriateness of the ballast that was on the track but you don't want me to consider [the] assistant chief [i.e., Mr. Chapman] when he talks about ballast and it was appropriately applied.

> MR. COWEN [attorney for Mr. Ward]: My witnesses aren't talking about ballast. My witnesses are making factual observations at various times throughout the same period of time that Mr. Ward worked there in the yard. When they worked in the yard there's standing water. Standing water over a period of time shows that they [i.e., ICRR] have not complied with the portion of the standard that requires [ballast to] to provide adequate drainage for the track.

As discussed in detail above, the crux of Mr. Ward's case is that he was injured by being required to walk on the ballast. In support of its preclusion defense, ICRR offered the testimony of its Assistant Chief Engineer, Mr. Chapman, who stated that the ballast used in

the Johnston Yard complied with the mandates of 49 C.F.R. § 213.103, including his opinion that the ballast "provides adequate drainage for the track." In order to avoid preclusion, the burden of production then fell to Mr. Ward to create a dispute of fact as to ICRR's compliance with the FRSA regulation. Thus, the question, at this stage in the litigation, is simply whether a dispute exists regarding whether ICRR complied with the mandates of 49 C.F.R. § 213.103. ICRR has cited no law in which the question of whether a railroad has complied with 49 C.F.R. § 213.103 must be established by expert proof. From our review of the federal ballast regulation, the regulation concerns not the composition or installation of the ballast but whether the ballast is adequately serving its purpose, i.e., whether the ballast is allowing proper drainage. *See* 49 C.F.R. § 213.103. To undermine Mr. Chapman's opinion that the ballast properly complied with 49 C.F.R. § 213.103, Mr. Ward offered the testimony of Mr. Bolden, who testified based on his observations of the railroad yard that the ballast allowed water to stand in the yard. Mr. Bolden's testimony that there was standing water on the yard, based on his own personal knowledge, was, thus, sufficient to controvert Mr. Chapman's affidavit that the ballast was providing proper drainage for the yard in compliance with 49 C.F.R. § 213.103. Indeed, in a similar case involving preclusion of a widow's FELA claim based on improper ballast and vegetation, this Court considered probative testimony from similarly situated employees of the defendant railroad that vegetation was overgrown and could cause problems for employees. *See Melton*, 322 S.W.3d at 189–90 (considering the testimony of a railroad carmen at to what he observed in the railway yard). Based on this testimony, the *Melton* Court concluded that material issues of fact existed that prevented summary judgment. *Id.* Likewise in this case, Mr. Bolden's testimony is competent to undermine Mr. Chapman's affidavit that ICRR was fully compliant with 49 C.F.R. § 213.103 and create a material factual dispute on this issue.

ICRR further points out that Mr. Bolden's testimony concerns an area of the yard in which Mr. Ward undisputedly did not work. Thus, ICRR contends that Mr. Bolden's testimony is "not probative." However, this Court has noted that:

> In order to withstand a defendant's motion for summary judgment, the plaintiff does not have to "show" breach and causation in the sense of proving those elements, but must simply establish by competent means that there is a dispute over those material issues of fact raised by the record.

*Bryant v. Bauguss*, 1996 WL 465539 (Tenn. Ct. App. 1996) (quoting *Gambill v. Middle Tenn. Med. Center, Inc.*, 751 S.W.2d 145, 146 (Tenn. Ct. App. 1988); *Bowman v. Henard*, 547 S.W.2d 527, 530–31 (Tenn.1977)). Thus, Mr. Ward is not required, at this stage, to prove that ICRR's failure to comply with federal regulations, i.e., its failure to install ballast that provided adequate drainage, was the proximate cause of his injuries. Instead, he simply

must submit some competent evidence that creates a dispute over whether the ballast was in compliance with federal regulations. Mr. Bolden's testimony goes directly to this issue. In addition, nothing in the record suggests that the ballast in C yard was any different from the ballast in Johnston yard where Mr. Ward worked primarily. As previously discussed, in ruling on a motion for summary judgment, we must give the non-moving party the benefit of all reasonable inferences. *See Giggers*, 277 S.W.3d at 364. In this case, it may be reasonable to assume, without any evidence to the contrary, that the ballast in C yard is the same as in Johnston yard. Having submitted evidence that some of the ballast in the railway yards was not properly draining in violation of 49 C.F.R. § 213.103, we conclude that Mr. Ward has met his burden to establish a material factual dispute regarding whether ICRR's ballast complied with federal regulations regarding drainage. We further note that Mr. Ward's burden is not to conclusively establish that there was a drainage issue with the ballast at the railway yard where he worked. Instead, to withstand ICRR's motion for summary judgment, Mr. Ward simply had to submit competent evidence that created uncertainty as to whether a factual dispute exists regarding ICRR's compliance with the federal regulation. As stated by our Supreme Court in *Evco Corp. v. Ross*, 528 S.W.2d 20 (Tenn. 1975):

> The summary judgment procedure was designed to provide a quick, inexpensive means of concluding cases, in whole or in part, upon issues as to which there is no dispute regarding the material facts. Where there does exist a dispute as to facts which are deemed material by the trial court, however, or where there is uncertainty as to whether there may be such a dispute, the duty of the trial court is clear. He [or she] is to overrule any motion for summary judgment in such cases, because summary judgment proceedings are not in any sense to be viewed as a substitute for a trial of disputed factual issues.

*Id.* at 24–25. Having met his burden to submit competent evidence calling into question whether ICRR was in compliance with 49 C.F.R. § 213.103, the grant of summary judgment was in error. *See Melton*, 322 S.W.3d at 190 (reversing the grant of summary judgment because there was a dispute as to whether the railroad complied with federal regulations). The judgment of the trial court is, therefore, reversed. All other issues are pretermitted.

For the foregoing reasons, the order of the trial court granting summary judgment is reversed and the case is remanded for all further proceedings as may be necessary and are consistent with this Opinion. Costs of this appeal are assessed against the Appellee, Illinois Central Railroad Company, for all of which execution may issue if necessary.

_____
J. STEVEN STAFFORD, JUDGE